SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Michelle Lodzinski (A-50-19) (083398)**

**Argued October 27, 2020 -- Decided May 26, 2021**

**Re-Argued on Reconsideration October 25, 2021 -- Decided December 28, 2021**

**ALBIN, J., writing for the Court.**

In 2016, a jury convicted Michelle Lodzinski of murdering her five-year-old son, Timothy Wiltsey, twenty-five years earlier. The issue in this case is whether the evidence, when viewed in its entirety, supported the finding that Lodzinski purposely or knowingly caused her son's death. See N.J.S.A. 2C:11-3(a)(1) and (a)(2).

In the days leading up to the May 25, 1991 carnival at Kennedy Park in Sayreville, nothing appeared amiss in the lives of Lodzinski and Timothy. Lodzinski had gotten Timothy his kindergarten graduation gown. She had purchased him a pair of Ninja Turtles sneakers the week before the carnival, and the two went shopping for new clothes the day before the event. On May 24, Lodzinski and Timothy were making plans with Lodzinski's sister Linda to visit her in Florida. Lodzinski also arranged to take her young niece Jessica to the carnival. Neighbors saw Timothy that night and the next morning. Lodzinski told law enforcement officers that, in the afternoon of May 25, she took Timothy to a park in Holmdel and that they went from there to the carnival in Sayreville, arriving around 7:00 p.m. Lodzinski did not pick up Jessica, as earlier planned.

Jennifer Blair (later Blair-Dilcher), Lodzinski's then-fourteen-year-old niece, and Blair's then-fourteen-year-old friend Danielle Gerding testified that shortly after their arrival at the carnival, they found Lodzinski standing alone. When they asked Lodzinski where Timothy was, Lodzinski told them that Timothy had been missing for fifteen minutes; she had turned around and he was gone. Blair and Gerding began searching for Timothy, and Gerding spoke with auxiliary police officer Kevin Skolnik.

Lodzinski told Skolnik that "she went to get her soda, she turned her back and her son was missing." Lodzinski described Timothy as sporting a crew cut and wearing a t-shirt and Ninja Turtles sneakers. An extensive search of the carnival and surrounding area by Sayreville police officers and firefighters failed to locate Timothy. A detective searched Lodzinski's car and found nothing of evidential value.

1

In the days that followed, investigators interviewed carnival workers and people present in Kennedy Park on May 25, including people who said they saw a boy who resembled or might have been Timothy.

The trial witnesses mostly agreed that Lodzinski was a loving mother who worked hard to care for and support her young son. Lodzinski's sister Linda and babysitter Danielle Gerding both stated Timothy was her "life." As the sole provider for Timothy, Lodzinski held a number of different jobs during Timothy's childhood. She worked as a secretary, a paralegal, a receptionist, a bank teller, and in retail. At times, she held two jobs at once. As with many single mothers, securing childcare was a struggle.

The morning after Timothy's disappearance, Lodzinski gave an audiotaped statement at Sayreville Police Headquarters. She recounted the previous day with Timothy and indicated that Timothy had on a red tank top, red shorts with printed black letters and little green men, Ninja Turtles sneakers, and gray tube socks. He went on several rides, and then Lodzinski walked over to a concession stand to get a drink while Timothy stood by the side of a trailer, where she could see him. Facing the concessionaire, she paid for the drink. When she turned around, Timothy was gone. A second search of Lodzinski's car and a search of her apartment and garbage yielded nothing of evidential value.

As the investigation into Timothy's disappearance continued, the media focused on the case -- and on Lodzinski. Four separate law enforcement agencies became involved in the investigation into Timothy's disappearance. The Court reviews in detail the occasions on which law enforcement questioned Lodzinski, as well as her emotional and verbal responses and shifts in her account of the day of Timothy's disappearance, which included inconsistent claims that he had been abducted by one or more people.

In October 1991, a man walking near the Raritan Center in Edison found a child's Ninja Turtles left sneaker. Based on a description of Timothy's clothes in the media, he turned the sneaker over to the police. Lodzinski at first said she did not think the sneaker was Timothy's but then said it could be. She did not say that she had once worked at the Raritan Center not far from where the sneaker was found. Several months later, Lodzinski indicated that she had worked there from September 1988 to March 1989.

During an April 1992 search of the Raritan Center, authorities found a Ninja Turtles right sneaker; a pillowcase; eleven bones from a child, including a skull and partial remnants of clothing; a balloon; and a ten-foot-by-three-foot blue blanket. Dental records revealed that the skull was Timothy's. No trace evidence was found on the blanket or pillowcase, and neither Lodzinski nor her parents expressed recognition of the blanket. In 1992, the Prosecutor's Office declined to bring charges against Lodzinski. Lodzinski relocated to Florida, became employed as a paralegal, and raised two sons. She kept photographs of Timothy and let her children know they had a brother.

2

The case remained dormant until, in June 2011, Sergeant Scott Crocco of the Middlesex County Prosecutor's Office reopened the investigation. Sergeant Crocco determined that if he "could link these items [the blanket or pillowcase] to [Lodzinski], it would be very powerful evidence." The Court recounts how Sergeant Crocco showed the blanket to Lodzinski's niece, Jennifer Blair-Dilcher, who had become estranged from her aunt, by whom she felt she had been betrayed. Blair-Dilcher immediately identified the blue blanket as coming from Lodzinski's apartment more than twenty years earlier.

In 2014, a grand jury charged Lodzinski with murder. The only significant new evidence acquired in the more than 20 years between the first and second investigations was Blair-Dilcher's identification of the blanket. On the eve of trial, in the midst of saturated pretrial publicity in this sensational murder case, two former babysitters also identified the blanket. At trial, however, a number of witnesses intimately familiar with Lodzinski's residences during the relevant time period did not identify the blanket. No such blanket appeared in any of the photographs of Lodzinski's apartments.

Following the return of the indictment, the State consulted with Dr. Geetha Natarajan, the retired Chief Medical Examiner of Middlesex County. Dr. Natarajan concluded that the cause of Timothy's death was undetermined but opined by "a preponderance of the evidence" that the manner of his death was homicide. Dr. Natarajan did not speculate about the degree of homicide -- that is, whether Timothy's death was caused negligently, recklessly, or purposely or knowingly.

At the close of trial, the court charged the jury on the elements of murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2), and on the lesser included offenses of aggravated manslaughter and reckless manslaughter. The jury found Lodzinski guilty of murder, and the court denied Lodzinski's motion for a judgment of acquittal notwithstanding the verdict.

The Appellate Division affirmed, stating that the standard for assessing a motion for a judgment of acquittal made after the return of a verdict is the same as for a motion made before entry of a verdict -- i.e., that "only the State's proofs will be considered." 467 N.J. Super 447, 457 (App. Div. 2019).

The Court granted certification. 241 N.J. 81 (2020). All six Justices participating in the case disapproved of the Appellate Division's position "that evidence presented by the defendant is irrelevant to the court's consideration when it reviews a post-trial motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2." 246 N.J. 331, 359 (2021) (Patterson, J., concurring). The six participating Justices agreed that "[w]hen a defendant moves for a judgment of acquittal after the verdict, we consider the evidence in its entirety, including the evidence that defendant presented," a standard that conforms with "federal constitutional norms." Id. at 340, 359-60. The Court split three-three on the application of the proper standard, and the judgment of the Appellate Division was affirmed "by an equally divided Court." Id. at 339 (per curiam).

3

Lodzinski then filed a motion for reconsideration. With Judge Jose L. Fuentes, the Appellate Division judge most senior in service, sitting as the seventh member of the Court, the Court granted reconsideration on the ground that the three-three split left in place a constitutionally defective Appellate Division judgment that had reviewed the sufficiency of the evidence under a standard that violated federal and state law. 248 N.J. 451, 455-56 (2021). Justices Patterson, Fernandez-Vina, and Solomon dissented, finding reconsideration inappropriate under Rule 2:11-6(b). See id. at 460-61, 473-75 (dissent).

**HELD:** After reviewing the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, no reasonable jury could find beyond a reasonable doubt that Lodzinski purposefully or knowingly caused Timothy's death. Even if the evidence suggested that Timothy did not die by accident, no testimony or evidence was offered to distinguish whether Timothy died by the negligent, reckless, or purposeful or knowing acts of a person, even if that person were Lodzinski.

1. The jury is the preeminent factfinder in our system of justice, and the rendering of a jury verdict is entitled to the greatest deference. Despite that great deference, the verdicts of juries are subject to the checks and balances in our criminal justice system. Rule 3:18-2 authorizes a court to enter a judgment of acquittal even after the return of a verdict of guilty, when the evidence does not rationally support a conviction. The power to enter a judgment of acquittal cannot be invoked because a judge has a mere difference of opinion with the outcome of a trial; it can be invoked only to prevent a miscarriage of justice. In assessing a motion for a judgment of acquittal notwithstanding the verdict pursuant to Rule 3:18-2, a reviewing court must view the entirety of the direct and circumstantial evidence presented by the State and the defendant and give the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt. However, giving the State the benefit of reasonable inferences does not shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt. (pp. 37-40)

2. Homicide generally can be categorized as negligent, reckless, or purposeful or knowing. To prove that Lodzinski murdered Timothy, the State was required to present evidence that proved beyond a reasonable doubt that Lodzinski "purposely" or "knowingly" "cause[d] death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a)(1) to (2) (emphases added). No conviction can stand unless the proofs support every essential element of the crime, including proof that the defendant possessed the requisite mental state to commit the crime. Stressing that no direct evidence tied Lodzinski to the murder of Timothy, the Court notes that circumstantial evidence can suffice to support a conviction and canvasses the record to determine whether the State satisfied each element of the crime of murder. (pp. 41-43)

4

3. The Court first reviews the testimony of the babysitters about the blanket, including questions raised about their motives for testifying. Whatever questions or doubts the defense may have raised about the blue blanket and the credibility of the babysitters, the standard of review requires that those doubts be put aside. The State is entitled to the benefit of the favorable trial evidence and the favorable inferences drawn from that evidence. A reasonable jury was entitled to credit the testimony of the three babysitters and conclude that the blue blanket came from Lodzinski's apartment -- and therefore Timothy was not at the carnival. (pp. 43-47)

4. The Court next considers the State's reliance on the various conflicting accounts that Lodzinski gave to law enforcement about her son's disappearance as evidence of consciousness of guilt. Viewing the inferences to be drawn from Lodzinski's inconsistent statements in the light most favorable to the State, a reasonable trier of fact could conclude that she was deceptive -- and that her false accounts were evidence of consciousness of guilt. But even viewing Lodzinski's statements in that light, without more -- without proofs establishing Lodzinski's precise conduct -- the statements do not illuminate whether Lodzinski was responsible for a negligent, reckless, or purposeful or knowing act and thus do not support the conclusion that she is a murderer. (pp. 47-51)

5. Turning to the testimony of the State's key medical expert, Dr. Natarajan, the Court notes that, even viewing the evidence in the light most favorable to the State and accepting Dr. Natarajan's opinion that Timothy did not die by accident, Dr. Natarajan did not attempt to classify Timothy's death as any particular kind of homicide. Dr. Natarajan's testimony did not provide the missing piece to the State's case -- evidence that Lodzinski, if she caused the death of her son, possessed the requisite mental state for a conviction of murder. (pp. 51-53)

6. The State offered motive evidence to suggest that Lodzinski had a reason to kill her son and to impute to her the requisite state of mind to commit murder, urging the jury to find that Lodzinski purposely or knowingly killed Timothy because she "was a young struggling mother" and "Timothy was a social burden." But most witnesses did not question Lodzinski's devotion to Timothy or suggest that she was anything but a loving and caring mother. It is not uncommon for a twenty-three-year-old single mother, raising a child on her own, to have financial and social challenges. That singularly unremarkable scenario hardly indicates a motive to murder one's child. The Court has rejected the very type of generalized class assumptions offered to the jury as a motive to commit a crime. See State v. Mathis, 47 N.J. 455, 471-72 (1966) (holding that the State cannot present as a motive for robbery that a person may be poor or unemployed). That a person is poor does not mean that he is inclined to commit a robbery; that a single working mother is the sole support of her son and dating, or even having difficulty in her relationships, does not mean she is inclined to murder her child. Stereotypes associated with single-parent women cannot substitute for an absence of evidence relating to an essential element of the offense of murder. (pp. 53-57)

5

7.  The final question is whether, viewing the evidence in the light most favorable to the prosecution, the State proved beyond a reasonable doubt that Lodzinski <u>purposely</u> or <u>knowingly</u> caused her son's death.  In other words, was there a rational basis in the record for the jury to find that the State satisfied every element of the offense?  The Court finds that a rational jury considering the evidence in the light most favorable to the State could conclude that Lodzinski did not take Timothy to the carnival and that she had some involvement in his disappearance, death, and burial.  But only the purposeful or knowing causing of death constitutes murder, and the prosecution offered no direct or inferential evidence that Lodzinski purposely or knowingly caused Timothy's death.  Bootstrapped inferences cannot substitute for the proof necessary to satisfy an element of an offense.  In summation, the prosecutor did not and could not guide the jury on how to rationally choose between reckless manslaughter or purposeful or knowing murder.  Viewing the evidence in the light most favorable to the State, the Court concludes that no rational jury -- without engaging in speculation or conjecture -- could conclude that Lodzinski purposely or knowingly caused Timothy's death.  (pp. 57-59)

**REVERSED.  Defendant's conviction is VACATED.**

**JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON, dissenting,** view the Court's reconsideration of this case to contravene the court rule that governs reconsideration and the majority's reasoning to undermine both the core principle of appellate deference to a jury verdict in a criminal trial and the jury's role at the heart of our criminal justice system.  In the dissent's view, the majority does the opposite of what the law requires and substitutes its own interpretation of the evidence for the conclusion reached by the jury.  The dissent views the following evidence to support a reasonable jury's determination that defendant is guilty of purposeful or knowing murder:
(1) evidence regarding the location where Timothy's remains were found, including Lodzinski's initial failure to reveal she had worked at the Raritan Center; (2) evidence regarding the blanket, from which a rational jury could reasonably infer that, after killing her son, defendant took a blanket from her home to transport his body; (3) defendant's contradictory accounts of, and conduct following, the alleged abduction, which -- because post-crime consciousness-of-guilt evidence may constitute proof of a defendant's culpability -- support a reasonable inference that defendant sought to mislead investigators to impede the investigation and deflect attention from her own culpability; (4) evidence of motive through testimony that defendant, raising her son with no financial support from his father, had difficulty finding adequate child care, maintaining a job, and establishing a stable relationship; and (5) expert testimony that Timothy died by homicide.  The dissent finds the jury's verdict fully justified by the evidence.

**JUSTICES LaVECCHIA and PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion.  JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON filed a dissent.  CHIEF JUSTICE RABNER did not participate.**

6

SUPREME COURT OF NEW JERSEY

A-50 September Term 2019

083398

State of New Jersey,

Plaintiff-Respondent,

v.

Michelle Lodzinski,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| October 27, 2020 | May 26, 2021 |

| Re-Argued on Reconsideration | Decided |
| --- | --- |
| October 25, 2021 | December 28, 2021 |

Gerald Krovatin argued the cause for appellant (Krovatin
Nau and Arseneault & Fassett, attorneys; Gerald
Krovatin, David W. Fassett, and Gregory D. Jones, on the
briefs).

Joie D. Piderit, Acting Assistant Prosecutor/Special
Deputy Attorney General, argued the cause for
respondent (Yolanda Ciccone, Middlesex County
Prosecutor, attorney; Joie D. Piderit, of counsel and the
briefs).

Lawrence S. Lustberg submitted a brief on behalf of
amici curiae American Civil Liberties Union of New
Jersey and Association of Criminal Defense Lawyers of

1

New Jersey (Gibbons and American Civil Liberties
Union of New Jersey Foundation, attorneys; Lawrence S.
Lustberg, Michael R. Noveck, Alexander Shalom, and
Jeanne LoCicero, on the brief).

Paul J. Casteleiro submitted a brief on behalf of amicus
curiae Centurion Ministries, Inc., d/b/a Centurion
(Centurion and Fox Rothschild, attorneys; Paul J.
Casteleiro, of counsel and on the brief, and Karen A.
Confoy, Jack L. Kolpen, Dominique J. Carroll, and
Allison L. Hollows, on the brief).

Debra G. Simms, Deputy Attorney General, submitted a
brief on behalf of amicus curiae Attorney General of New
Jersey (Gurbir S. Grewal, Attorney General, attorney;
Debra G. Simms, of counsel and on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

In 2016, a jury convicted Michelle Lodzinski of murdering her five-year-old son, Timothy Wiltsey, twenty-five years earlier. The issue in this case is whether the evidence, when viewed in its entirety, supported the finding that Lodzinski purposely or knowingly caused her son's death. See N.J.S.A. 2C:11-3(a)(1) and (a)(2).

On May 25, 1991, Timothy went missing. On that day, Lodzinski claimed that Timothy was abducted from a carnival at Kennedy Park in the Borough of Sayreville. Over the course of multiple interrogations, she gave shifting accounts about Timothy's disappearance that cast doubt on her credibility. But Lodzinski never made an incriminating admission, not to the

2

police during many long and exhausting interrogations, not to a former boyfriend who surreptitiously recorded her -- not to anyone. Eleven months later, Timothy's incomplete skeletal remains were found in a shallow creek bed, not far from an office where Lodzinski had previously worked.

No forensic evidence -- no DNA, fiber, or trace evidence -- tied Lodzinski to the child's death. Searches of her house, her car, and her garbage generated no evidence of guilt. No one ever observed Lodzinski abuse Timothy. No witness could say where, when, or precisely how Timothy died. The medical examiner could not determine the cause of death, only that the manner of death was homicide. By most accounts, Lodzinski was caring and devoted to her son, though challenged by the demands of everyday life as a young single mother.

In 1992, an exhaustive investigation by municipal, county, state, and federal law enforcement agencies did not result in the return of any criminal charges against Lodzinski or anyone else. The case remained dormant for almost two decades, and Lodzinski went on with her life. She moved to Florida, where she started a family, raised two children, and was employed as a paralegal.

Nineteen years later, in 2011, Sergeant Scott Crocco of the Middlesex County Prosecutor's Office reopened the investigation and enlisted

Lodzinski's estranged niece, who had babysat for Timothy decades earlier, to attempt to elicit a confession from her aunt. After that effort failed, Sergeant Crocco displayed for the niece a large blanket found near Timothy's remains. The niece identified the blanket, recalling its presence in Lodzinski's apartment two decades earlier when she babysat Timothy. The identification of that blanket, if believed, undermined Lodzinski's account of Timothy's disappearance at the carnival.

In 2014, a Middlesex County grand jury charged Lodzinski with murder.

On the eve of trial, in the midst of saturated pretrial publicity in this sensational murder case, two former babysitters also identified the blanket. At trial, however, a number of witnesses intimately familiar with Lodzinski's residences during the relevant time period could not identify the blanket. No such blanket appeared in any of the photographs of Lodzinski's apartments.

The State's retained medical examiner concluded that Timothy's death was not accidental but the result of a homicide. The medical examiner did not offer an opinion whether Timothy was the victim of a negligent, reckless, or purposeful or knowing homicide.

After the jury found Lodzinski guilty of murder, the trial court denied her motion for a judgment of acquittal notwithstanding the verdict. A panel of the Appellate Division affirmed, finding that the evidence presented at trial

4

was sufficient to support the murder conviction. In making that determination, however, the panel considered only the State's and not the defense's evidence. This Court unanimously held that the appellate panel erred by not assessing the entirety of the evidence and that the panel's standard of review violated our constitutional jurisprudence and court rules.

The six members of the Court sitting on this appeal split three-three on whether, under the correct standard of review, the entirety of the evidence supported Lodzinski's murder conviction. Today, with the presence of the Appellate Division judge most senior in service, we are constituted as a seven-member Court.

We now hold that after reviewing "the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony," no reasonable jury could find beyond a reasonable doubt that Lodzinski purposefully or knowingly caused Timothy's death. State v. Williams, 218 N.J. 576, 594 (2014) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).

The jury is the ultimate trier of fact in our system of justice, and the greatest deference is given to its factual findings. A court cannot substitute its judgment for that of the jury or second-guess a jury's verdict merely because it might have come to a different outcome if it were the factfinder.

5

Our criminal justice system, however, recognizes that juries are not infallible. The checks and balances built within our system of justice are intended to prevent a miscarriage of justice. To that end, our trial and appellate courts are granted a reservoir of power -- though rarely invoked -- to overturn a conviction that is not rationally based in the evidence. See R. 3:18-1; R. 3:18-2. However difficult its task may be, a court on a Rule 3:18-2 motion must ensure that a jury verdict meets the evidential standard mandated by our constitutional jurisprudence and court rules.

Even if the evidence suggested that Timothy did not die by accident, no testimony or evidence was offered to distinguish whether Timothy died by the negligent, reckless, or purposeful or knowing acts of a person, even if that person were Lodzinski. No conviction can be founded on speculation or conjecture. We may never know the truth about what happened in this case. The only issue is whether the evidence -- presented in the light most favorable to the prosecution -- supports a finding beyond a reasonable doubt that Lodzinski purposely or knowingly caused the death of her son.

By that standard the conviction cannot be sustained. We therefore reverse the judgment of the Appellate Division and grant Lodzinski's motion for a judgment of acquittal.

I.

A.

The following facts are derived from the testimony of the many witnesses who appeared for the prosecution and defense, as well as the exhibits introduced into evidence, during a twenty-eight-day jury trial.

1.

Timothy's Disappearance

In the days leading up to the carnival at Kennedy Park in Sayreville on May 25, 1991, nothing appeared amiss in the lives of Michelle Lodzinski and her five-year-old son Timothy. Lodzinski had gotten Timothy his kindergarten graduation gown. She had purchased him a pair of Ninja Turtles sneakers the week before the carnival, and the two went shopping for new clothes the day before the event.

On May 24, Lodzinski and Timothy were making plans with Lodzinski's sister Linda to visit her in Florida and go to Disney World. According to her sister, Lodzinski and Timothy seemed excited about attending the carnival the next day. Lodzinski also arranged to take her young niece Jessica to the carnival.

That evening, a neighbor chatted with Lodzinski and Timothy on their front porch about the carnival as they awaited a pizza delivery. To the

neighbor, Timothy "seemed very happy, and [Lodzinski] seemed in a good mood, too."

The next morning, May 25 at around 11:00 a.m., a neighbor who lived across the street from Lodzinski saw Timothy, dressed in shorts and a polo shirt, playing with a friend outside. Lodzinski left a message on the answering machine of her then-boyfriend, Fred Bruno, telling him that she and Timothy were going to the carnival that day.

Lodzinski told law enforcement officers that, in the afternoon, she took Timothy to Holmdel Park in Holmdel, where they walked around a lake, visited the petting zoo, and played kickball.[1] From there, they went to the carnival at Kennedy Park in Sayreville, arriving around 7:00 p.m. Lodzinski did not pick up Jessica, as earlier planned.

Jennifer Blair (later Blair-Dilcher), Lodzinski's then-fourteen-year-old niece, and Blair's then-fourteen-year-old friend Danielle Gerding testified that shortly after their arrival at the carnival, they found Lodzinski standing alone. When they asked Lodzinski where Timothy was, Lodzinski told them that Timothy had been missing for fifteen minutes; she had turned around and he

---

[1] Lodzinski did not testify at trial. The events described here are derived from statements made by Lodzinski to law enforcement officers.

was gone.  According to Gerding, Lodzinski appeared calm but "in shock" and with "tears in her eyes."

Blair and Gerding began searching for Timothy, and a short while later Gerding spoke with auxiliary police officer Kevin Skolnik.  Lodzinski told Skolnik that "she went to get her soda, she turned her back and her son was missing."  Lodzinski described Timothy as sporting a crew cut and wearing a t-shirt and Ninja Turtles sneakers.

Skolnik's report at the time noted that Lodzinski was "sobbing" and "looked like a zombie."  In his testimony twenty-five years later, however, he recalled that Lodzinski did not appear upset or hysterical.  A person on a concession line remembered pleasantly chatting with Lodzinski and later seeing her -- "serious, not happy, but just concerned" -- with a gentleman.

Skolnik called Sayreville police officers to assist in the search for Timothy.  Sayreville Police Detective Richard Sloan testified that Lodzinski appeared calm, relaxed, and cooperative when talking with police at the carnival.

An extensive search of the carnival and surrounding area by Sayreville police officers and firefighters failed to locate Timothy.  Detective Raymond Szkodny searched Lodzinski's car, which was parked across the street in the

9

parking lot of the Sayreville War Memorial High School. Szkodny found nothing of evidential value in the car.

In the days that followed, investigators interviewed carnival workers and people present in Kennedy Park on May 25.

On May 26, a carnival worker, Diana Courtney, told investigators at Sayreville Police Headquarters that, sometime after 7:00 p.m. the previous evening, a little boy with short light brown hair wearing a red tank top shirt and red printed shorts appeared at her stand. A woman called out to him, and they left. According to Courtney's account to the investigators, about ten minutes after the little boy appeared at her stand, she saw the same woman walking back and forth calling out his name, referring to him as Jimmy or Timmy, "and she looked like she was concerned, like she was looking for him." A detective showed Courtney a photograph of several children seated around a table, and Courtney pointed to a boy in the photograph (Timothy) and said he looked like the child at her stand. At headquarters, the investigators apparently arranged for Courtney to view Lodzinski, and Courtney said that Lodzinski may have been the woman with the boy.

James O'Connell, a carnival worker, stated that at 7:15 p.m. on May 25, he helped a young boy who "fit[] the description of Timothy Wiltsey" on and off his ride. The boy was "about five years old" and wearing a tank top shirt,

10

shorts, and "Teenage Mutant Ninja shoes." O'Connell gave this account to the police in a signed statement on May 30, 1991. When he later saw pictures of Timothy on posters, he was "positive" that the boy he saw was Timothy.[2]

Three teenagers leaving the carnival noticed broken glass on the pathway and warned a little boy with Ninja Turtles shoes, accompanied by a woman and two men, to watch out for the glass.

On the evening of May 25, a firefighter drove Lodzinski to her home to retrieve an item that might provide a scent for police dogs to try to find Timothy. On the way back to Kennedy Park, Lodzinski asked him to stop at Fatso Fogarty's, an establishment where her boyfriend, Fred Bruno, worked. According to Bruno, when Lodzinski entered and told him that Timothy was missing, "[s]he was crying. She wasn't speaking very clearly. I was just trying . . . to calm her down."

After the search at the carnival concluded at 2:00 a.m., Sayreville Police Detective Szkodny drove Lodzinski home. According to the detective's report, when Lodzinski entered her residence, she let out a "slight sob and a tear came

_____

[2] After the Lodzinski trial began, in February 2016, Sergeant Crocco showed O'Connell a videotape taken of the ride he operated at some point on May 25, 1991. O'Connell pointed to a boy on the videotape that he believed to be Timothy, though he stated that after twenty-five years, he could not be sure. The boy in that videotape was not Timothy. It is unclear whether the time the video was taken corresponds with the time O'Connell recalled placing a boy matching Timothy's description on the ride.

11

out of each eye."  In his testimony in 2016, however, he stated that "she was very calm."

At around 3:00 or 4:00 a.m., Lodzinski's sister received a call from Lodzinski who was "crying" and "upset."  Lodzinski told her sister that Timothy was missing.  The next day, Lodzinski went to Sayreville Police Headquarters to give Detective Sloan clothes for Timothy in case the police found him.  Detective Sloan noted that she was tearful and "genuinely upset as a mother would be."

2.

Lodzinski's Relationship with Timothy

Lodzinski met George Wiltsey when she was a teenager visiting her brother in Iowa.  The two began a dating relationship, and Lodzinski became pregnant.  Lodzinski moved to Iowa, where Wiltsey's parents and Lodzinski's brother lived.  In August 1985, at age seventeen, Lodzinski gave birth to Timothy.  After six months of living in an abusive atmosphere, Lodzinski returned to New Jersey with Timothy.  Wiltsey never maintained a relationship with or provided child support for his son.

For approximately two years, Lodzinski and Timothy resided in the South Amboy home of Lodzinski's sister and brother-in-law.  Afterwards,

12

Lodzinski found an apartment close by for her and Timothy. In time, she and Timothy moved to two other apartments in South Amboy.

The trial witnesses mostly agreed that Lodzinski was a loving mother who worked hard to care for and support her young son. Lodzinski's sister Linda and babysitter Danielle Gerding both stated that Timothy was her "life." Lodzinski helped Timothy with his homework and bought him new clothes. She brought him to the dentist for frequent dental work and to the hospital when he was bit by a dog. And she took him on camping trips as well as to parks and birthday parties. With the money she earned, she sent Timothy to St. Mary's School in South Amboy for the 1990-1991 school year. The school nurse described Timothy as a well-behaved and healthy young boy. Yet, he was absent on twenty-five school days and came late to school sixty-three times.[3]

As the sole provider for Timothy, Lodzinski held a number of different jobs during Timothy's childhood. She worked as a secretary, a paralegal, a receptionist, a bank teller, and in retail. At times, she held two jobs at once. As with many single mothers, securing childcare was a struggle. She relied on friends, family members, and teenage babysitters to watch Timothy and

---

[3] The record does not reveal how late Timothy arrived at school or the reasons for his tardiness.

13

frequently had to take Timothy to work with her.[4]  Lodzinski often came late

to work.

Lodzinski had two significant relationships during Timothy's childhood.

She dated Andrew Mianulli, and the two became engaged.  Mianulli described

Timothy as "a great kid" and "[r]eally nice" though shy.  He took Timothy to

the park, softball games, and other activities.  Mianulli broke off the

engagement because, in the end, Mianulli felt he was too young and did not

want Lodzinski to be his life partner.

Afterwards, Lodzinski had an on- and off-again relationship with Fred

Bruno.  Bruno explained that he was young, "trying to get [his] own life

together," and not prepared for "a ready-made family."

3.

The Investigation

The morning after Timothy's disappearance, Lodzinski gave an

audiotaped statement to Detective Sloan at Sayreville Police Headquarters.

She recounted the previous day with Timothy -- the afternoon at Holmdel

Park, where she played kickball with her son, and their arrival at the carnival

in Sayreville around 7:00 p.m.  Timothy had on a red tank top, red shorts with

---

[4]  When Timothy was four years old, Lodzinski sent him to live with her brother in Minnesota for two months.

printed black letters and little green men, Ninja Turtles sneakers, and gray tube socks. He went on several rides, and then Lodzinski walked over to a concession stand to get a drink while Timothy stood by the side of a trailer, where she could see him. Facing the concessionaire, she paid for the drink. When she turned around, Timothy was gone.

That morning, May 26, three Sayreville police officers conducted a second search of Lodzinski's car, which had not been moved from the high school parking lot. They found a ball the size of a soccer ball or basketball but nothing of evidential value. That same day, Detective Sloan arranged for New Jersey Bell to place a tap on Lodzinski's telephone line to record the telephone numbers of incoming calls.

Two days later, on May 28, agents of the Middlesex County Prosecutor's Office searched Lodzinski's apartment but found no evidence suggesting foul play or that Lodzinski was in any way involved in Timothy's disappearance. During the course of the investigation, Lodzinski's landlord turned over Lodzinski's garbage to the Federal Bureau of Investigation (FBI) for analysis. Nothing of evidential value was produced. Later, after Timothy's remains were found, law enforcement officers pulled sections of carpet from Lodzinski's apartment and submitted them to the FBI for testing. Nothing of evidential value was detected on the carpet.

As the investigation into Timothy's disappearance continued, the media focused extensive coverage on the case -- and on Lodzinski. Lodzinski called her sister everyday "distraught," confiding that she was not "sleeping or eating." She told Bruno, her boyfriend, that she could not "hold anything down."

Four separate law enforcement agencies became involved in the investigation into Timothy's disappearance: the Sayreville Police Department, the New Jersey State Police, the Middlesex County Prosecutor's Office, and the FBI. Representatives of all four agencies interrogated Lodzinski, who, over time, gave differing accounts of what occurred at the carnival.

On June 4, 1991, Lodzinski handwrote a statement to the FBI in the presence of Detective Sloan, repeating the account she had given earlier about Timothy's disappearance.

Two days later, on June 6, Detectives Sloan and Szkodny questioned Lodzinski again, attempting to elicit additional information. During the three-hour interrogation, Lodzinski told the detectives ten times, "I don't know where Timothy is at." At some point, she put her head down and began "sobbing heavily." As the questioning continued, she eventually stated that she saw an "older man" take Timothy off a ride and walk her son toward a younger man. She added that she yelled out, and the older man responded,

16

"stay away, or the boy is going to get injured." Pressed by the detectives on the subject, Lodzinski stated, "[y]ou wanted to hear something so I told you that." Lodzinski got angry and said, "go ahead and charge me if you think you could," and walked out of the conference room. Later that day, Lodzinski returned to police headquarters and told Detective Szkodny that she made up the story about the two men.

On June 7, 1991, Detectives Sloan and Szkodny again questioned Lodzinski, and this time she gave another account of Timothy's disappearance. Lodzinski told the detectives that, while Timothy was on a ride at the carnival, she was approached by a woman whom she knew by the name of "Ellen." According to Lodzinski, Ellen, who drove a red Camaro, cashed welfare checks at the bank where Lodzinski had worked as a teller in 1986 and 1987. Ellen, who was accompanied by two men and a young girl, offered to watch Timothy while Lodzinski purchased a soda. When Lodzinski returned, however, Timothy was gone, as were Ellen, the two men, and the young girl. Lodzinski gave a description of Ellen (whom she believed had been a go-go dancer), the two men, and the young girl. Lodzinski explained that she had withheld that account out of "her concern" for Timothy's safety.

That evening, a Sayreville police sergeant asked Fred Bruno, by then Lodzinski's former boyfriend, to make an intercepted telephone call to

17

Lodzinski. During the recorded conversation, Bruno repeatedly challenged the truthfulness of Lodzinski's "Ellen" story. She refused to speak with him on the telephone. The next day, at the direction of the police, Bruno planted a microphone in his car's visor. During a recorded conversation in Bruno's car, Lodzinski repeated the same account that she had given to the detectives concerning her encounter with Ellen. She told Bruno that she initially did not tell the police about leaving her son with a virtual stranger at the carnival because she feared that would portray her as a bad mother.[5]

On the morning of June 13, 1991, Lodzinski was questioned by a New Jersey State Police lieutenant and sergeant. During a five-hour unrecorded interrogation, Lodzinski reiterated her account about her encounter with Ellen but added details inconsistent with her previous statements. Lodzinski stated that Ellen offered to watch Timothy as he got on a ride, and Lodzinski went to purchase a drink. As she walked to the concession stand, Lodzinski claimed that one of the men threatened her with a knife, stating, "if you don't want anything to happen to him, then you should continue on and don't return." Her interlocutors pointed out discrepancies in her statements about her son's abduction. At this point, according to the State Police lieutenant, Lodzinski

---

[5] In his testimony, Bruno claimed that in an earlier unrecorded conversation, Lodzinski stated that Ellen "pulled a knife and put it to Timmy, and -- [Ellen] took him in the car" and drove off with the group that had accompanied her.

became "irritated" and stated, "if you're going to charge me, charge me," and she walked out of the interrogation room and refused to speak with the State Police again.

Detective Sloan, who had taken Lodzinski to the State Police Division Headquarters, then drove her to the Sayreville Police Headquarters. There, she was questioned for several more hours.

Lodzinski basically restated to Detective Sloan the same account she had given to the State Police in the morning. Sloan repeatedly accused Lodzinski of not being truthful as the questioning continued. Lodzinski explained that in her initial interview with Detective Sloan "she was afraid to tell the truth" and "did not want Timmy to get hurt" by the people who had abducted him. She stated that one of the male abductors threatened her with a knife and threatened to harm Timothy if she did not remain silent and walk away. According to Lodzinski, the abductor stated that she "might see him, in a month I'd get a phone call if I didn't say anything." Detective Sloan observed that Lodzinski was "quiet" and "subdued" as she spoke.

By the time the interrogation concluded shortly after 9:00 p.m., Lodzinski had not eaten for more than twelve hours. After that interrogation, friends took Lodzinski to the emergency room of the South Amboy Memorial Hospital, where she received counseling for an apparent mental breakdown.

19

Five days later, on June 18, Investigator Mary Robillard of the Middlesex County Prosecutor's Office interviewed Lodzinski in her home. Lodzinski basically restated the events at the carnival she had described during her most recent interrogations. From the photographs displayed to her, Lodzinski could not identify the woman she named as Ellen. During the questioning, Lodzinski exhibited hostility toward Investigator Robillard, giving one- or two-word responses. Finally, Lodzinski burst into tears, saying, "He was the most important thing in the world to me." Letting out a scream, she told Robillard that she was "sick and tired" of the implied accusations and ordered Robillard to get out of her house.

In August 1991, as Timothy's birthday approached amidst the media frenzy in the case, Lodzinski visited her sister in Florida for two weeks and sought counseling.

4.

The Discovery of Timothy's Remains

On October 26, 1991, a wildlife enthusiast was walking near Olympic Drive in Raritan Center located in Edison when he found a child's Teenage Mutant Ninja Turtles left sneaker. Based on a description of Timothy's clothes in the media, he turned the sneaker over to the Sayreville Police Department.

Detective Szkodny displayed the sneaker to Lodzinski. At first, she did not think it was Timothy's. Weeks later, when reports about the sneaker's finding appeared in the newspaper, she called the detective and asked to view the sneaker again. After a second look, Lodzinski told Szkodny, "It could be his sneaker." Lodzinski had earlier provided Detective Szkodny the box in which the sneakers had been purchased, and the sneaker was consistent with the specifications on the box. Lodzinski did not tell Detective Szkodny that she had once worked in Raritan Center not far from where the sneaker was found.

In late November, one month afterwards, Detective Szkodny, Detective Charles Clark of the Middlesex County Prosecutor's Office, and FBI Agent Tony Pagano searched the area where the sneaker was discovered but found nothing of interest.

On March 4, 1992, FBI Agent Ronald Butkiewicz, who replaced Agent Pagano on the case, interviewed Lodzinski in the presence of her attorney. Lodzinski repeated the account previously given to other law enforcement agencies involving Ellen. In Agent Butkiewicz's mind, she did so in a "surprisingly unemotional" manner.

On April 3, 1992, Agent Butkiewicz spoke with Lodzinski's mother and learned that Lodzinski had once worked at a company named Florida

21

Fulfillment at Raritan Center. On April 21, Agent Butkiewicz interviewed Lodzinski again and asked her to provide a list of her prior employers. Lodzinski named twelve prior employers, including Florida Fulfillment. When asked the location of Florida Fulfillment, she responded, Raritan Center. Lodzinski had worked at Florida Fulfillment from September 1988 to March 1989.

On April 23 and 24, 1992, law enforcement officers from the FBI, the New Jersey State Police, the Middlesex County Prosecutor's Office, and the Sayreville Police Department searched an area off Olympic Drive in Raritan Center. The search led to the following discoveries:

1) a Mutant Ninja Turtles right sneaker in an area thirty yards from where the left sneaker had been found six months earlier;

2) a pillowcase lying near the sneaker;

3) a child's skull, leg bones, hip bones, and foot bones (eleven bones in all), as well as partial remnants of clothing waistbands lying in the bed of Red Root Creek -- about 100-150 yards from the location of the sneakers;[6]

---

[6] The bones, other than the skull, and the clothing were recovered after dredging the creek.

4) a Ninja Turtles balloon lying in the creek bed near the child's remains; and

5) a ten-foot-by-three-foot blue blanket partially buried on an embankment, ten to twenty feet above the creek bed from where the child's remains were located.

All the evidence gathered was found in an area of Raritan Center where trash was often discarded.

Agent Butkiewicz found the blanket but did not photograph it before he pulled it from the ground and shook dirt from it -- and perhaps trace evidence.

Dental records revealed that the skull was Timothy's. Timothy's remains were found approximately four-tenths of a mile, as the crow flies, from Florida Fulfillment, located at 375 Raritan Center Parkway in Raritan Center, where Lodzinski had worked for a six-month period several years earlier.[7]

On the evening of April 23, Detective Sloan and Lieutenant Thomas Rizzo of the Middlesex County Prosecutor's Office advised Lodzinski that the remains recovered were Timothy's. According to Sloan, "she had no visible response." The detectives then proceeded to interrogate Lodzinski about prior

---

[7] To reach the burial site from Florida Fulfillment, one would have to walk or drive south on Raritan Center Parkway, past another building, and then turn east onto Olympic Drive and travel a distance.

statements she made to law enforcement investigators. When questioned about Olympic Drive, Lodzinski explained that she never left the building area of Florida Fulfillment and "was never on Olympic Drive" or even knew it existed.

Dr. Marvin Shuster, the Chief Medical Examiner of Middlesex County, conducted an autopsy on April 25, 1992. His examination of Timothy's remains, the eleven bones including the skull, revealed no sign of fracture or trauma. Dr. Shuster could not determine the cause of death.

The blanket, pillowcase, waistbands, and balloon found off Olympic Drive were sent to an FBI laboratory for testing. The testing did not reveal any evidence tying Lodzinski or her home to any of the items. No blood, bodily fluids, fibers, fingerprints, hair, or other trace evidence was found on the blanket or the pillowcase.[8] When shown the blanket by Lieutenant Rizzo, neither Lodzinski nor her parents recognized it. Apparently, no effort was made to compare the pillowcase found off of Olympic Drive with any pillowcase in Lodzinski's residence.

In 1992, the Prosecutor's Office declined to bring charges against Lodzinski. Lodzinski moved on with her life. She relocated to Florida and

---

[8] An expert witness on trace evidence testified that he observed a glittery fiber on the blanket that compared microscopically to a glittery fiber on the pillowcase.

became employed as a paralegal. She raised two sons, one born in 1998, and the other born in 2002. She kept Timothy's photograph on the nightstand in her bedroom and a photo album of Timothy on a shelf in the house and let her children know they had a brother.

5.

The Investigation Reopens

For nearly twenty years the case remained dormant until, on June 1, 2011, Sergeant Crocco of the Middlesex County Prosecutor's Office received a tip about Timothy's case that "proved to be inaccurate." Nevertheless, Sergeant Crocco reopened the investigation into Timothy's death. Sergeant Crocco reviewed the case file and determined that if he "could link these items [the blanket or pillowcase] to [Lodzinski], it would be very powerful evidence." Lodzinski became the target of the renewed investigation.

The first person Sergeant Crocco interviewed was Lodzinski's estranged niece, Jennifer Blair-Dilcher on June 21, 2011. Crocco enlisted a willing Blair-Dilcher in a plan "to create a dialogue with [her aunt] in an effort to elicit some sort of confession." Blair-Dilcher contacted Lodzinski through Facebook, and though the two messaged each other, the effort to extract incriminating information from Lodzinski failed.

Nine days after that first interview, on June 30, Sergeant Crocco laid out the blanket, the pillowcase, and a red jacket on a table in a room in the Prosecutor's Office. Sergeant Crocco brought Blair-Dilcher into the room, telling her that he wanted to "show her some items." She immediately identified the blue blanket as coming from Lodzinski's apartment where she had babysat Timothy more than twenty years earlier. Blair-Dilcher believed that she had "snuggle[d] up with Timothy" under the blanket while babysitting him.

Although earlier in her life Blair-Dilcher considered Lodzinski "her best friend," when she identified the blanket, she harbored a deep animus toward her aunt. A brief look backward explains the breach that occurred between Blair-Dilcher and Lodzinski.

From 1990 to 1991, at ages thirteen and fourteen, Blair-Dilcher frequently babysat Timothy. In the years after Timothy's death, Blair-Dilcher maintained a close relationship with her aunt. In time, Blair-Dilcher married and had two children, but she developed a heroin addiction. When Blair-Dilcher entered a drug rehabilitation program in Florida for treatment, she entrusted her children to Lodzinski's care. Lodzinski and her sister determined that returning the children to Blair-Dilcher in her then-condition would not be

26

responsible. Blair-Dilcher's mother-in-law offered to take the children and traveled to Florida to pick them up.

From that point forward -- as revealed in a letter that Blair-Dilcher wrote to her uncle in April 2010 -- she blamed Lodzinski for the temporary loss of the custody of her children and for ruining her life. In that letter, Blair-Dilcher stated that she would never forgive Lodzinski for turning the children over to her mother-in-law -- a woman whom she apparently detested. Blair-Dilcher believed that Lodzinski had "betrayed [her]."

In the seven months after Blair-Dilcher identified the blanket, Sergeant Crocco displayed the blanket to a number of people who were close to Lodzinski in 1991: Blair-Dilcher's mother, Renee Buckley; Cheryl Kassay, Lodzinski's closest friend in 1991; another friend, Danielle Billand; and Lodzinski's brother, Edward. None recognized the blanket.

On October 18, 2011, Sergeant Crocco sent the blanket to the New Jersey State Police Laboratory to test for trace evidence. The single hair recovered by the Laboratory did not match either Lodzinski's or Blair-Dilcher's DNA profile. Four years later, Crocco sent a hair found on the pillowcase for DNA testing. That hair did not match Lodzinski's DNA profile either.

27

In 2014, a Middlesex County grand jury returned an indictment charging Lodzinski with murder.  See N.J.S.A. 2C:11-3(a)(1) and (a)(2).  The only significant new piece of evidence that the Prosecutor's Office acquired in the more than twenty years between the first and second investigations was Blair-Dilcher's identification of the blue blanket.

6.

The Blanket

As the scheduled date of Lodzinski's trial approached, with jury selection to begin in January 2016, Sergeant Crocco renewed his effort to see whether others familiar with Lodzinski in 1991 could recognize the blue blanket.  Between November and December 2015, Crocco showed the blue blanket to Michael Lodzinski, Lodzinski's brother; Andy Mianulli, Lodzinski's former fiancé; and Theresa Packard, Lodzinski's former landlord and neighbor.  None recognized the blanket.

Two former babysitters, however, remembered seeing the blue blanket in Lodzinski's apartment.

When she was fourteen years old, Danielle Gerding had babysat Timothy "once in a while" in 1990 and 1991 over a six-month period with her "good friend[]" Blair-Dilcher.  On July 14, 2011, when Sergeant Crocco first interviewed Gerding, she recalled only one blanket in Lodzinski's apartment --

28

a blanket with animated characters draped over the back of the couch. At that time, Crocco did not show Gerding the ten-by-three-foot blue blanket.

Four years later, on October 5, 2015 -- just three months before the start of the trial and in the midst of extensive pretrial publicity, which included news stories about Blair-Dilcher's identification of the blue blanket -- Crocco showed Gerding the blue blanket.[9] Gerding positively identified the blanket as present in the living room of Lodzinski's home twenty-five years earlier during the winter of 1990-1991.

Dawn Matthews babysat Timothy from 1988 into 1990, when she was between the ages of fifteen and seventeen. On December 21, 2015, two weeks

---

[9] News coverage abounded about the Lodzinski case and Blair-Dilcher's identification of the blanket in the weeks and months before Gerding made her identification. See, e.g., Mark Mueller & Susan K. Livio, Lodzinski Murder Trial to Proceed, Court Rules, Star-Ledger, Sept. 24, 2015, at 15 ("The judge appeared to give credence to the [S]tate's key piece of evidence: a blue-and-white blanket discovered near Timothy's remains. Lodzinski's niece, Jennifer Blair, identified the blanket as Timothy's when investigators brought it to her in 2011 . . . ."); Suzanne Russell, State: Timothy Wiltsey's Death Was No Accident, mycentraljersey (Sept. 23, 2015), https://www.mycentraljersey .com/story/news/local/middlesex-county/2015/09/23/wiltsey-fbi-file-has-no-impact-lodzinski-motions/72616764 (reporting that the trial court denied Lodzinski's motion to dismiss the indictment and that Blair-Dilcher "positively identified that blanket as coming from defendant's home"); Trial Date Set for Woman Accused of Killing Son in Decades-Old New Jersey Cold Case, CBSNewYork (Aug. 20, 2015), https://newyork.cbslocal.com/2015 /08/20/michelle-lodzinski-trial-date-set (reporting that the State's evidence against Lodzinski included "a blanket found near Timothy's body," which a "key witness immediately recognized").

before jury selection, Sergeant Crocco showed the blanket to Matthews. She positively identified it as the one she saw in Lodzinski's apartment twenty-five years earlier. She was sure because the blanket had "a metallic kind of threading in it" and because Timothy "would cuddle with it at night before he went to bed." Matthews admitted that, when she identified the blanket, she knew that Lodzinski was about to stand trial "because it was on TV, and . . . in the newspaper and whatnot."

Photographs of Lodzinski's home during the relevant time period depicted "a pink and blue and white blanket" and a "blue, purple, [and] white" hand-crocheted blanket draped on the back of the couch. None of those photographs depicted the blue blanket identified by Blair-Dilcher, Gerding, and Matthews.

7.

The Medical Examiner

Following the return of the indictment, the State consulted with Dr. Geetha Natarajan, the retired Chief Medical Examiner of Middlesex County. Dr. Natarajan did not perform the autopsy or examine Timothy's remains but instead relied on Dr. Shuster's autopsy report, expert reports on radiology and odontology, and photographs. She also relied on information supplied by Sergeant Crocco.

In January 2015, Dr. Natarajan, like Dr. Shuster, concluded that the cause of Timothy's death was undetermined. Dr. Natarajan reached that conclusion because only eleven of Timothy's bones, including his skull, were recovered. None of those bones showed any sign of injury or fracture. Because "the ribs and the vertebrae" were missing, there was no way to determine whether any other part of the skeleton would have revealed an injury or fracture. Additionally, none of Timothy's organs or tissue remained. Dr. Natarajan could not offer an opinion on "when," "where," or "how" Timothy died.

Nevertheless, Dr. Natarajan opined by "a preponderance of the evidence" that the manner of Timothy's death was homicide. She came to that determination not based on forensic evidence, such as a gunshot or knife wound, drowning, strangulation, physical abuse, or poisoning. Rather, she came to that conclusion based on the process of elimination, ruling out natural death, suicide, and accident. From Dr. Natarajan's expert viewpoint, the fact that Timothy's body "was found in a creek, and remained there for a considerable period of time," excluded the possibility that Timothy died as a result of an accident or from natural causes. Dr. Natarajan affirmed that she held her "opinions within a reasonable degree of medical certainty."

31

Although Dr. Natarajan opined that the manner of death was homicide, she did not speculate about the degree of homicide -- that is, whether Timothy's death was caused negligently, recklessly, or purposely or knowingly.

8.

Joseph McShane

Damien Dowdle, a defense witness, claimed that Joseph McShane -- his former criminal confederate and cellmate from Arizona -- admitted to him that he sexually assaulted and murdered a child at an event near "Atlanta City." No evidence was presented, however, that McShane was in New Jersey at the time of Timothy's disappearance or involved in any way in Timothy's death.

B.

After the defense and prosecutor concluded their summations, the court charged the jury on the elements of murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2), and on the lesser included offenses of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). The jury found Lodzinski guilty of murder.

C.

The court denied Lodzinski's motion for a judgment of acquittal notwithstanding the verdict, R. 3:18-2, rejecting Lodzinski's argument that the

evidence was insufficient to support the verdict.[10]  The court sentenced

Lodzinski to a thirty-year term of imprisonment subject to a thirty-year period

of parole ineligibility, N.J.S.A. 2C:11-3(b), plus fines and penalties.

D.

In a published opinion, the Appellate Division affirmed Lodzinski's

murder conviction.[11]  State v. Lodzinski, 467 N.J. Super 447 (App. Div. 2019).

The Appellate Division stated that, in assessing a motion for a judgment of

acquittal before the entry of a verdict, R. 3:18-1, or after the return of a

verdict, R. 3:18-2, the standard is the same.  Id. at 457.  The panel accepted the

mistaken proposition "that whether the motion to acquit is made at the end of

the State's case or after the end of the entire case . . . only the State's proofs

will be considered."  Ibid.  (emphasis added by the panel) (quoting State v.

Sugar, 240 N.J. Super. 148, 152-53 (App. Div. 1990)).  Viewing the

sufficiency of the evidence through that narrow lens, the panel rejected

Lodzinski's Rule 3:18-2 motion.  Id. at 467.  It held that "there was sufficient

---

[10]  The trial court also had denied Lodzinski's motion for a judgment of
acquittal at the end of the State's case pursuant to Rule 3:18-1.

[11]  We recite only that portion of the Appellate Division's opinion that
addresses the sufficiency-of-the-evidence issue.

evidence to prove beyond a reasonable doubt that Lodzinski purposefully or knowingly caused [Timothy's] death." Ibid.

II.

This Court granted Lodzinski's petition for certification.[12] See 241 N.J. 81 (2020).

In a per curiam opinion, all six Justices participating in the case[13] disapproved of the Appellate Division's position "that evidence presented by the defendant is irrelevant to the court's consideration when it reviews a post-trial motion for a judgment of acquittal notwithstanding the verdict under Rule 3:18-2." State v. Lodzinski (Lodzinski I), 246 N.J. 331, 339, 359 (2021) (Patterson, J., concurring). All six Justices agreed that "[w]hen a defendant moves for a judgment of acquittal after the verdict, we consider the evidence in its entirety, including the evidence that defendant presented." Id. at 340 (citing Williams, 218 N.J. at 594). All concurred that our state law requirement under Rule 3:18-2, that a court consider both the State's evidence and the defendant's evidence in determining the sufficiency of the evidence,

---

[12] Lodzinski's petition challenged the conviction on two grounds: the sufficiency of the evidence and the removal of a juror during deliberations. The Court unanimously found the second issue unmeritorious. State v. Lodzinski (Lodzinski I), 246 N.J. 331, 341, 382-84 (2021) (Patterson, J., concurring).

[13] The Chief Justice did not participate in this case.

conformed with "federal constitutional norms." Id. at 359-60 (citing Jackson v. Virginia, 443 U.S. 307, 316, 319 (1979)).

The Court split three-three on the application of the proper standard. Id. at 339 (per curiam). Three Justices found the evidence sufficient to convict Lodzinski of murder, id. at 340, 362-79 (Patterson, J., concurring); and three Justices found the evidence insufficient, id. at 384-402 (Albin, J., dissenting). The Court affirmed the judgment of the Appellate Division "by an equally divided Court." Id. at 339.

Lodzinski then filed a motion for reconsideration pursuant to Rule 2:11-6(a). She argued that our Court's equally divided affirmance of the Appellate Division, which upheld her conviction based on a standard contrary to federal and state law, deprived her of a ruling under a correct standard, and thus violated "her federal and state constitutional rights to due process."

To resolve the reconsideration motion by a fully constituted Court, Justice LaVecchia, serving as the Presiding Justice, ordered the temporary assignment to this Court of Judge Jose L. Fuentes, the Appellate Division judge most senior in service. State v. Lodzinski (Lodzinski II), 248 N.J. 451, 453 n.1 (2021).

With Judge Fuentes sitting as the seventh member of the Court, we granted Lodzinski's motion to reconsider her Rule 3:18-2 sufficiency-of-the-

35

evidence argument. Id. at 456. We were compelled to grant the motion because this Court's three-three split left in place a constitutionally defective Appellate Division judgment -- a judgment upholding Lodzinski's conviction based on a sufficiency-of-the-evidence standard of review in violation of federal and state law. Id. at 455-56. Justice Patterson, Justice Fernandez-Vina, and Justice Solomon dissented, finding reconsideration inappropriate under Rule 2:11-6(b). Id. at 460-62, 473-75 (Patterson, Fernandez-Vina, and Solomon, JJ., dissenting).

## III.

We now reconsider Lodzinski's motion for a judgment of acquittal notwithstanding the verdict, R. 3:18-2, under the appropriate standard with a seven-member Court.[14]

## A.

Lodzinski argues that the State did not prove beyond a reasonable doubt the necessary elements for finding her guilty of murder. She claims that the State did not present sufficient proof that she caused Timothy's death or that she had the requisite mens rea to commit murder, that is, that she knowingly or purposely caused Timothy's death. She also contends the purported motives

---

[14] The Court ordered Lodzinski and the State to appear for re-argument to address the issue of the sufficiency of the evidence under the correct standard of review. Amici curiae did not participate in the oral argument.

attributed to her by the State do not support an inference that she murdered her son.

B.

The State asserts that the evidence in the record, when viewed in the light most favorable to the prosecution, supports the verdict of murder. The State claims that (1) the presence of Timothy's blanket at the burial scene is proof that he was not abducted at the carnival; (2) that her various contradictory statements to the police were the equivalent of "[Lodzinski]'s confession" and constituted consciousness of guilt; (3) that her financial struggles and the burden of raising a child as a single mother served as a motive to kill her son; and (4) that the discarding of his body in a desolate area, not far from where Lodzinski previously worked, established that the homicide was committed purposely or knowingly.

IV.

The jury is the preeminent factfinder in our system of justice, and the rendering of a jury verdict is entitled to the greatest deference. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011). Despite that great deference, the verdicts of juries are subject to the checks and balances in our criminal justice system. Jury verdicts, like the decisions of judges and every decision involving human judgment, are susceptible to error. It is

37

understood that "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson, 443 U.S. at 317. Indeed, "the same may be said of a trial judge sitting as a jury." Ibid. But a conviction that is not rationally based in the evidence "cannot constitutionally stand." Id. at 318. Such a conviction would offend basic principles of due process guaranteed by the Fourteenth Amendment. Ibid.

Our Rules of Court grant judges a residuum of power to vacate a jury conviction that is not rationally supported by the evidence. Rule 3:18-1 provides that a court must enter a judgment of acquittal after the close of the State's case or after the close of the defendant's case if "the evidence is insufficient to warrant a conviction." Rule 3:18-2 is an additional safeguard, authorizing a court to enter a judgment of acquittal even after the return of a verdict of guilty, when the evidence does not rationally support a conviction. The power to enter a judgment of acquittal cannot be invoked because a judge has a mere difference of opinion with the outcome of a trial; it can be invoked only to prevent a miscarriage of justice. See Risko, 206 N.J. at 521.

In assessing a motion for a judgment of acquittal notwithstanding the verdict pursuant to Rule 3:18-2, a reviewing court must view the entirety of the direct and circumstantial evidence presented by the State and the defendant

and give the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt. See Williams, 218 N.J. at 594 (applying that standard after the close of the defendant's case under Rule 3:18-1); Reyes, 50 N.J. at 458-59 (applying that standard after the close of the State's case under Rule 3:18-1).

That standard for determining the sufficiency of "all of the evidence" is also commanded by the due process guarantee of the Federal Constitution. Jackson, 443 U.S. at 317-19. For due process purposes, the relevant inquiry is whether, after viewing all of "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (noting that that test "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law").

In evaluating the sufficiency of the evidence, we recognize that jurors "may draw an inference from a fact whenever it is more probable than not that the inference is true," and that "the veracity of each inference need not be established beyond a reasonable doubt." See State v. Brown, 80 N.J. 587, 592 (1979). However, giving the State the benefit of reasonable inferences does not "shift or lighten the burden of proof, or become a bootstrap to reduce the

State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid.; accord State v. Perez, 177 N.J. 540, 549-50 (2003). Speculation, moreover, cannot be disguised as a rational inference. Cf. State v. LaFera, 42 N.J. 97, 119 (1964). An accused "may not be condemned upon surmise, conjecture or suspicion." Ibid.

Our review of a motion for a judgment of acquittal under Rule 3:18-2 is de novo. State v. Jones, 242 N.J. 156, 168 (2020); Williams, 218 N.J. at 593-94. We assess the sufficiency in the record anew, and therefore we owe no deference to the findings of either the trial court or Appellate Division. Cf. Williams, 218 N.J. at 586.

With those principles in mind, we must determine whether the entirety of the evidence, both direct and circumstantial, when viewed in the light most favorable to the prosecution, rationally supported the jury's finding beyond a reasonable doubt that Lodzinski murdered her son Timothy. See State v. Mayberry, 52 N.J. 413, 436-37 (1968).

V.

A.

Generally, homicide can fall within one of three separate categories: negligent, reckless, or purposeful or knowing.[15]  Under the New Jersey Code of Criminal Justice, "[c]riminal homicide is murder, manslaughter or death by auto or vessel."  N.J.S.A. 2C:11-2(b).  Criminal homicide constitutes murder if a person "purposely" or "knowingly" "causes the death of another human being" and manslaughter if a person "recklessly" "causes the death of another human being."  N.J.S.A. 2C:11-2(a), 3, 4.

To prove that Lodzinski murdered Timothy, the State was required to present evidence that proved beyond a reasonable doubt that Lodzinski "purposely" or "knowingly" "cause[d] death or serious bodily injury resulting in death."  N.J.S.A. 2C:11-3(a)(1) to (2) (emphases added).  No conviction can stand unless the proofs support every essential element of the crime, including

---

[15]  New Jersey does not recognize the crime of negligent homicide, although many states do.  See, e.g., Ariz. Rev. Stat. Ann. § 13-1102; La. Stat. Ann. § 14:32; Mont. Code. Ann. § 45-5-104(1) ("A person commits the offense of negligent homicide if the person negligently causes the death of another human being."); N.Y. Penal Law § 125.10 (McKinney) ("A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person."); Or. Rev. Stat. § 163.145; Tex. Pen. Code § 19.05 (2019).  The Model Penal Code also recognizes the crime of negligent homicide.  Model Penal Code § 210.4(1) (Am. Law Inst., Proposed Official Draft 1962) ("Criminal homicide constitutes negligent homicide when it is committed negligently.").

proof that the defendant possessed the requisite mental state to commit the crime. See N.J.S.A. 2C:2-2(a) to (b); State v. Sexton, 160 N.J. 93, 98-99 (1999).

We begin by observing that no direct evidence tied Lodzinski to the murder of her son Timothy. No witness testified that Lodzinski either killed or inflicted any injury on Timothy. Although subjected to approximately twelve interrogations by four different law enforcement agencies, Lodzinski never confessed to committing a crime against Timothy. Nor did she implicate herself when surreptitiously recorded by her former boyfriend. Nor did she make an incriminating admission to any person in the twenty-five years before her trial or, to our knowledge, afterwards.

The searches of Lodzinski's home, car, and garbage uncovered no clues -- no DNA, hair, or other forensic evidence -- linking Lodzinski to Timothy's disappearance or suggesting foul play. The blanket recovered at Raritan Center contained no blood, bodily fluid, hair, fibers, or other trace evidence that connected it with Lodzinski, Lodzinski's home, or Blair-Dilcher. The one hair fiber found on the blanket apparently belonged to an unidentifiable person. No one identified the pillowcase recovered at the scene, nor did the State offer any testimony that law enforcement attempted to compare the pillowcase with others in Lodzinski's home.

42

The absence of direct evidence, however, was not fatal to the State's case. The State relied on circumstantial evidence and inferences that the jury was permitted to draw from the testimonial and physical evidence. To be sure, circumstantial evidence often can be as persuasive and powerful as direct evidence and sufficient to support a conviction. State v. Goodman, 9 N.J. 569, 581 (1952).

We now canvass the record to determine whether the State provided proof to satisfy each element of the crime of murder.

B.

Although Lodzinski gave varying accounts of Timothy's disappearance, in her many statements to the authorities, she remained adamant that she took Timothy to the carnival. Seemingly supportive of her account, two carnival workers told law enforcement that they believed they saw a child fitting Timothy's description at the carnival. Additionally, three teenagers leaving the carnival saw a little boy wearing Ninja Turtles sneakers accompanied by a woman and two men, suggestive of Lodzinski's "Ellen" account.

To be clear, the jury did not have to credit the evidence suggesting that Lodzinski took Timothy to the carnival or the supposed sightings by the carnival workers. Three former teenage babysitters testified that the blanket recovered near Timothy's remains was a household item in Lodzinski's

43

apartment around 1991.  No one testified that a child fitting Timothy's description was carrying a ten-foot-by-three-foot blue blanket at the carnival.

The weight to be given to the babysitters' testimony was a matter for the jury -- despite the questions raised about their motives and recall and the evidence that contradicted their testimony.

We briefly review their testimony.

Blair-Dilcher, Lodzinski's niece, babysat Timothy when she was thirteen and fourteen years old, in 1990 and 1991.  Blair-Dilcher and Lodzinski's intimate relationship ruptured years later when Blair-Dilcher, while in a drug recovery program, gave the care of her children to Lodzinski.  Apparently for the children's welfare, Lodzinski transferred the children to Blair-Dilcher's mother-in-law.  Blair-Dilcher told her uncle that she would "never forgive" Lodzinski for the temporary loss of the custody of her children.  In 2011, when Sergeant Crocco approached her, Blair-Dilcher became a willing collaborator in a plan to elicit an online confession from Lodzinski.  That effort failed.  One week later, however, when Sergeant Crocco showed Blair-Dilcher the blue blanket, Blair-Dilcher positively identified it as the blanket in which she and Timothy cuddled twenty years earlier.

Before Lodzinski's 2014 indictment, other than Blair-Dilcher, a number of people close to Lodzinski in 1991were shown the blanket; none, however, recalled that blanket being in her apartment.

In 2011, Sergeant Crocco interviewed Danielle Gerding, who had babysat Timothy when she was fourteen years old -- "not too often," just "once in a while" with her friend Blair-Dilcher. In the 2011 interview, Gerding recalled only a blanket with animated characters on the back of a couch in Lodzinski's apartment. However, three months before trial, amidst widespread pretrial publicity, Crocco showed the blue blanket to Gerding. Twenty-four years after she had last visited Lodzinski's apartment, Gerding identified the blanket.

When Dawn Matthews was between the ages of fifteen and seventeen, from 1988 into 1990, she babysat Timothy. Crocco showed the blue blanket to Matthews in late December 2015, two weeks before the start of the trial, in the wake of saturated media coverage, which included Blair-Dilcher's identification of the blanket. Matthews also positively recalled the blanket as present in Lodzinski's apartment.

No other witness intimately familiar with Lodzinski's apartment in 1991 -- other than the three teenage babysitters -- could identify the blanket. Neither Lodzinski's mother, father, brothers, sister, landlord, best friend, nor

45

former fiancé recognized the blanket.  Photographs of Lodzinski's apartment taken around 1991 showed various blankets -- but none showed the blue blanket found near Timothy's remains.

The blanket was recovered in an area that was a dumping ground for all types of items.  When Agent Butkiewicz found the blue blanket, partially buried, on an embankment above the location of Timothy's remains, he did not photograph or carefully retrieve it.  Instead, he pulled it from the ground and shook dirt from it -- and perhaps forensic evidence.

At trial, the prosecutor did not suggest that Timothy's body was wrapped or buried in the ten-foot-by-three-foot blanket.  No trace or DNA evidence connected the blanket to Lodzinski's apartment.  Law enforcement apparently did not consider the blanket to be a critical piece of evidence in 1992 because it was shown only to Lodzinski and her parents at that time.  Waiting more than two decades to show the blanket to other witnesses certainly did not enhance the identification process.

Whatever questions or doubts the defense may have raised about the blue blanket and the credibility of the three babysitters, our standard of review requires that we put them aside.  The State is entitled to the benefit of the favorable trial evidence and the favorable inferences drawn from that evidence.  A reasonable jury was entitled to credit the testimony of the three babysitters

46

and conclude that the blue blanket came from Lodzinski's apartment -- and therefore Timothy was not at the carnival.  See Brown, 80 N.J. at 592.

## C.

The State relied on various conflicting accounts that Lodzinski gave to law enforcement about her son's disappearance as evidence of consciousness of guilt.  On the day Lodzinski first reported Timothy's disappearance at the carnival, and in the days immediately afterwards, Lodzinski generally gave the same account:  at about 7:15 p.m., she left Timothy by the side of a trailer while she went to a concession stand to get a drink, and when she turned around, he was gone.

On June 6, 1991, over a period of three hours, Detectives Sloan and Szkodny interrogated Lodzinski.  She stated multiple times that she did not know Timothy's whereabouts, and she sobbed.  As the questioning continued, the detectives' disbelief became evident.  The interrogation persisted, and eventually Lodzinski changed her story.  She indicated that an older man had taken Timothy off a ride and, with a younger man, absconded with Timothy.  When the detectives pressed for details, Lodzinski responded, "[y]ou wanted to hear something so I told you that."  Angrily, she told them to charge her if they could, walked out of the conference room, and returned later stating the story was false.

The next day, the same detectives interrogated Lodzinski again, and this time she told them that she had left Timothy with Ellen and two men while she went to a concession stand, and when she returned, Timothy was gone. She generally repeated that story the following day to her boyfriend who wire-recorded the conversation at the behest of the police.

Beginning on the morning of June 13, Lodzinski was interrogated for five hours by the State Police, and later interrogated for an additional three hours by Sayreville Police Detective Sloan and Detective Clark from the Prosecutor's Office. During those interrogations, Lodzinski further altered her story, claiming that one of the men with Ellen threatened her with a knife and told her she might get Timothy back in a month if she did not "say anything." After a twelve-hour day, during which Lodzinski was interrogated and transported by law enforcement officers, she was checked into a local hospital for treatment after an apparent mental breakdown.

On June 18, Investigator Robillard interviewed Lodzinski in her home. Lodzinski repeated the enlarged Ellen account, broke down crying, exclaimed that Timothy meant the world to her, and ordered Robillard to leave.

The State emphasized that Lodzinski, at first, did not mention to law enforcement that she had worked at a company in Raritan Center after she learned that a sneaker believed to be Timothy's was found off of Olympic

48

Drive in Raritan Center. She later claimed that she did not know that there was an Olympic Drive in Raritan Center, and when asked to give the name and location of her employers, she listed Florida Fulfillment at Raritan Center.

The jury was free to draw a number of permissible inferences from Lodzinski's changing accounts. One permissible inference was that Lodzinski's inconsistent statements indicated she was lying to conceal a crime. Another permissible inference was that Lodzinski's encounter with Ellen and Ellen's two male companions fit the descriptions given by some people at the carnival. And third, the jury could have concluded that Lodzinski was under immense psychological pressure to give an account that satisfied her disbelieving interlocutors and continued to change her account until one would be accepted and the questioning would stop.[16]

---

[16] See Welsh S. White, False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions, 32 Harv. C.R.-C.L. L. Rev. 105, 124-25 (1997) ("A suspect who is eager to please and anxious to avoid conflict with an authority figure will want to accept an interrogator's view of the facts even if he disagrees with it."); Zieva Dauber Konvisser, "What Happened to Me Can Happen to Anybody" -- Women Exonerees Speak Out, 3 Tex. A&M L. Rev. 303, 313 (2015) (noting that women who are "'coping with deep personal losses'" are "'especially vulnerable to high-pressure interrogation tactics,'" which makes them susceptible to giving "false confessions or statements that could appear inculpatory" (quoting Bluhm Legal Clinic, Center on Wrongful Convictions, Why Women's Cases Are Different, http://www.law. northwestern.edu/legalclinic/wrongfulconvictions/womensproject/ [https://perma.cc/JZ8L-SY8S])); Speaking of Psychology: False Confessions Aren't Always What They Seem, (Am. Psych. Ass'n podcast Sept. 2017),

Viewing the inferences to be drawn from Lodzinski's inconsistent statements in the light most favorable to the State, a reasonable trier of fact could conclude that she was deceptive -- and that her false accounts were evidence of consciousness of guilt. But the question remains, guilty of what? The testimony did not shed light on exactly what happened to Timothy, and the medical examiner did not indicate that Timothy's death was purposely or knowingly caused.

This case is unlike State v. Williams, where consciousness of guilt applied to a well-defined set of facts. 190 N.J. 114, 125-28 (2007). In Williams, the defendant wielded a shotgun in the direction of a guest in his home. Id. at 119-20. The weapon discharged, killing the guest, and the defendant then attempted to cover up his role in the shooting. Ibid. The defendant attempted to enlist several witnesses in the cover-up. Id. at 120. The cover-up evidence was offered as post-crime evidence of consciousness of guilt to show that the shooting was not an accident but rather a reckless act constituting manslaughter. Id. at 121.

---

https://www.apa.org/research/action/speaking-of-psychology/false-confessions (noting that a suspect deprived of sleep and under stress and trauma from the loss of a loved one is "rendered vulnerable to manipulation" during an interrogation).

Here, on the other hand, even when Lodzinski's inconsistent statements are viewed in the light most favorable to the State, without more -- without proofs establishing Lodzinski's precise conduct -- the inconsistent statements do not illuminate whether Lodzinski was responsible for a negligent, reckless, or purposeful or knowing act of wrongdoing.

Lodzinski's inconsistent statements do not support the conclusion that she is a murderer.  See Stobaugh v. State, 421 S.W.3d 787, 867 (Tex. Ct. App. 2014) ("[A] conclusion from [a defendant]'s lies and inconsistent statements that [the defendant] possessed the mens rea necessary for the offense of murder . . . reached by speculation will not support a finding beyond a reasonable doubt.").

D.

The State's key medical expert, Dr. Natarajan, did not perform Timothy's autopsy or examine his remains, which consisted of a mere eleven bones.  None of the bones recovered revealed a fracture or injury.  The absence of a skeleton and other remains left Dr. Natarajan without sufficient evidence to determine the cause of Timothy's death -- whether he died from a fall or drowning, or some other innocent means, or whether he died by foul play, such as by a knife or gunshot wound, or by strangulation, physical abuse, or poisoning.  Nor could Dr. Natarajan explain "when," "where," or "how"

51

Timothy died. For example, Dr. Natarajan could not say whether Timothy died off of Olympic Drive and drowned in the creek or died somewhere else.

In the absence of any forensic evidence identifying the manner of death, Dr. Natarajan reached the conclusion by a "preponderance of the evidence" through the process of elimination that Timothy died by "homicide." Dr. Natarajan ruled out suicide, natural death, and accident, mainly because Timothy's "body was found in a creek [and had] remained there for [a] considerable period of time." She opined that the manner in which Timothy was buried made accident an unlikely scenario and therefore Timothy's death would "have to be an unnatural death." Dr. Natarajan stated that there was no evidence "pointing towards any kind of accident." Yet, no medical or forensic evidence pointed in another direction.

But even viewing the evidence in the light most favorable to the State and accepting Dr. Natarajan's opinion that Timothy did not die by accident, Dr. Natarajan did not attempt to classify Timothy's death as any particular kind of homicide. Dr. Natarajan avoided speculating or conjecturing about the degree of homicide that led to Timothy's death.

Dr. Natarajan concluded only that the manner of death was homicide. She did not and could not venture a medical or scientific opinion that a person purposely or knowingly caused Timothy's death. Although Dr. Natarajan was

not permitted to opine on the ultimate question of Lodzinski's guilt, the dearth of evidence precluded her from reaching a conclusion on cause of death, other than unknown. Dr. Natarajan's testimony did not provide the missing piece to the State's case -- evidence that Lodzinski, if she caused the death of her son, possessed the requisite mental state for a conviction of murder.

### E.

The State offered motive evidence to suggest that Lodzinski had a reason to kill her son and to impute to her the requisite state of mind to commit murder. But the motive evidence -- as presented in the prosecutor's opening and summation -- was based on questionable tropes and stereotypes about single working mothers.

The prosecutor urged the jury to find that Lodzinski purposely or knowingly killed Timothy because she "was a young struggling mother" and "Timothy was a social burden."[17] It is true that Lodzinski raised Timothy as a

---

[17] In her opening statement, the prosecutor stated that "Michelle Lodzinski was a young, struggling mother with no support from Timmy's father . . . she was straining to provide and care for her child . . .the solution to [defendant]'s problems was to murder her . . . biggest burden."

In her summation, the prosecutor stated that:

> Michelle Lodzinski . . .struggled to provide and care for [Timothy] while maintaining a life of her own. She bounced from job to job. She was unable to find a

single mother without child support from his father; that she brought Timothy to her workplace when she could not find daycare; that she once called herself a "weekend mom"; that she changed jobs with some frequency and was often late to work; that she forgot to call the babysitter a "handful of times" when she could not make it home; and that Timothy was often late to or absent from school.

Nevertheless, most witnesses did not question her devotion to Timothy or suggest that she was anything but a loving and caring mother. At times, Lodzinski worked more than one job. Nothing in the record indicates that Lodzinski was unable to provide for Timothy's healthcare and material needs. She took Timothy for extensive dental work, and when he suffered a dog bite, she took him to the hospital. No one testified that Timothy was not well clothed or fed. In the week before Timothy went missing, Lodzinski bought Timothy a new set of clothes and his favorite Ninja Turtles sneakers. Lodzinski, moreover, sent Timothy to a private school for kindergarten.

---

steady, satisfying relationship. She was unable to find a man willing to care for someone else's child.

. . . .

Michelle Lodzinski was a young struggling mother. Struggling to provide and care for her child. And. . . . Timmy was a burden on her.

Timothy's kindergarten graduation gown was hanging in his closet at the time of his disappearance.

It is not uncommon for a twenty-three-year-old single mother, raising a child on her own, to have financial and social challenges. That singularly unremarkable scenario hardly indicates a motive to murder one's child. This Court has rejected the very type of generalized class assumptions offered to the jury as a motive to commit a crime. See State v. Mathis, 47 N.J. 455, 471-72 (1966). We held in Mathis, for example, that the State cannot present as a motive for robbery that a person may be poor or unemployed. Id. at 472 ("[T]here must be something more than poverty to tie a defendant into a criminal milieu."). The problem with generalized class assumptions of the type in Mathis and in this case is that they miscast whole sectors of our population as potential criminals. Id. at 471 ("Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many."). That a person is poor does not mean that he is inclined to commit a robbery; that a single working mother is the sole support of her son and dating, or even having difficulty in her relationships, does not mean she is inclined to murder her child.

The record does not support the prosecutor's argument that Lodzinski was looking desperately for a man to marry her and care for her child -- or that

55

the failure to find that match rendered Timothy "a burden on her" and drove her to murder. Like many young people in their early twenties, Lodzinski experienced some disappointments in her relationships. She went through a broken engagement, and at the time of Timothy's disappearance, she had an on- and off-again relationship with Fred Bruno. Timothy did not appear to be an impediment to the success of either of those relationships. It surely would be an unsurprising fact to most single working parents with children that some dating partners are not looking for a ready-made family. Yet, the prosecutor took the trope of the single mother longing for a husband as a basis to impute a motive to commit murder.

Although single-parent child-rearing is exceedingly common, societal stereotypes about single parents, particularly single mothers, persist. See, e.g., Nancy E. Dowd, Stigmatizing Single Parents, 18 Harv. Women's L.J. 19, 20 (1995) ("Both socially and legally, we relentlessly stigmatize single parents as bad parents who have broken, incomplete, dysfunctional families which result in predictably disastrous consequences for their children."). Lodzinski's single-parent status was representative of many women, and her economic plight was as well. See id. at 26-28.

The problem with using the challenges that Lodzinski faced as a single parent as a motive to commit murder "is that it would prove too much against

56

too many." See Mathis, 47 N.J. at 471. Stereotypes associated with single-parent women cannot substitute for an absence of evidence relating to an essential element of the offense of murder.

VI.

The final question is whether, viewing the evidence in the light most favorable to the prosecution, the State proved beyond a reasonable doubt that Lodzinski purposely or knowingly caused her son's death. In other words, was there a rational basis in the record for the jury to find that the State satisfied every element of the offense?

In answering that question, we do not ask whether reasonable people might disagree about facts in dispute. Although reasonable people might differ about whether a child described at the carnival was in fact Timothy; whether the three babysitters two decades later accurately identified the blanket found near Timothy's remains as coming from Lodzinski's apartment; whether Lodzinski's varying statements about Timothy's disappearance were the product of deception or the psychological pressures of interrogation and grief; or whether the proximity of Timothy's remains to the location of the business where Lodzinski previously worked was a mere coincidence; the jury was well within its province to accept the State's view on all of those points.

57

A rational jury considering that evidence in the light most favorable to the State could conclude that Lodzinski did not take Timothy to the carnival and that she had some involvement in his disappearance, death, and burial. But still no evidence or testimony was presented about how, when, or where Timothy died, or the cause of his death. Even assuming that accident could be ruled out based on the discovery of Timothy's remains in a creek bed, the best that Dr. Natarajan could say was that the manner of death was homicide. As noted earlier, the law generally recognizes three degrees of homicide: negligent, reckless, and purposeful or knowing. Dr. Natarajan did not hazard a guess on the type of homicide that led to Timothy's death.

Only the purposeful or knowing causing of death constitutes murder. The prosecution, however, offered no direct or inferential evidence that Lodzinski purposely or knowingly caused Timothy's death -- an essential element of the crime of murder. Bootstrapped inferences cannot substitute for the proof necessary to satisfy an element of an offense. See Brown, 80 N.J. at 592. In summation, the prosecutor did not and could not guide the jury on how to rationally choose between reckless manslaughter or purposeful or knowing murder.

The jury holds a high and esteemed place in our system of justice, and the greatest deference is rightly afforded to a jury verdict. Risko, 206 N.J. at

521. But all human endeavors are susceptible to error -- and jury deliberations are no different. Although some errors will evade detection or are beyond correction, our constitutional jurisprudence and our court rules will not tolerate errors that result in a miscarriage of justice. Ibid. Even a jury verdict is not sacrosanct.

The due process requirements of both our Federal and State Constitutions -- as well as Rule 3:18-2 -- mandate that our courts vacate a conviction based on evidence from which "no rational trier of fact could find guilt beyond a reasonable doubt," Jackson, 443 U.S. at 317; see also State v. Medina, 147 N.J. 43, 49-50 (1996). A jury may not fill a missing element of an offense by resorting to "conjecture" or "pure speculation." Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947).

Accepting that a rational jury could credit the State's argument that Lodzinski played a role in Timothy's disappearance and death does not end the analysis. The State had the burden of proving Lodzinski's state of mind -- that she purposely or knowingly, rather than recklessly or negligently, caused Timothy's death. Viewing the evidence in the light most favorable to the State, we conclude that no rational jury -- without engaging in speculation or conjecture -- could conclude that Lodzinski purposely or knowingly caused Timothy's death.

59

It is not often that a judge or panel of judges will enter a judgment of acquittal notwithstanding a jury verdict, R. 3:18-2, particularly in a murder case. Given the deference afforded a jury verdict, the justification for the grant of a Rule 3:18-2 motion should be clear. Undoubtedly, the decision to vacate a jury verdict is a difficult one. That is true whether the trial receives little public attention or is intensely covered in the media. Rule 3:18-2, however, anticipates that there comes a time when that difficult decision must be made. We do so today because our constitutional obligation demands no less.

## VII.

For the reasons expressed, we reverse the judgment of the Appellate Division and enter a judgment of acquittal notwithstanding the jury's verdict. Lodzinski's murder conviction is vacated.

JUSTICES LaVECCHIA and PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON filed a dissent. CHIEF JUSTICE RABNER did not participate.

State of New Jersey,

Plaintiff-Respondent,

v.

Michelle Lodzinski,

Defendant-Appellant.

JUSTICE PATTERSON, JUSTICE FERNANDEZ-VINA, and JUSTICE SOLOMON, dissenting.

This Court "has traditionally deferred to the jury the delicate and difficult task of deciding the facts on which a defendant's guilt or innocence depends." State v. Pelham, 176 N.J. 448, 470 (2003) (Albin, J., dissenting). When it reviews "a record of historical facts that supports conflicting inferences," an appellate court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson v. Virginia, 443 U.S. 307, 326 (1979).

Our law accordingly imposes a stringent burden on a defendant who seeks a judgment of acquittal notwithstanding a jury's guilty verdict. A court must afford to the State the benefit of favorable testimony and all reasonable favorable inferences to be drawn from that testimony, and must sustain a jury

1

verdict unless no reasonable jury could find that the State has proven guilt beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-59 (1967). If any reasonable jury could convict a defendant with the evidence viewed and inferences drawn favorably to the State, appellate judges must respect that verdict, no matter how strongly they disagree. Ibid.

In defendant Michelle Lodzinski's twenty-eight day trial, the jury considered the evidence presented by the State and the defense and unanimously voted to convict defendant of the purposeful or knowing murder of her five-year-old son, Timothy Wiltsey. The trial judge, present in the courtroom for the testimony of every witness and thoroughly familiar with the parties' proofs, ruled that the evidence supported a reasonable jury's decision to convict defendant and denied defendant's motion for a judgment notwithstanding the verdict. The Appellate Division unanimously affirmed that determination. Sitting as a court of six, this Court was evenly divided, thus affirming defendant's conviction under the Court's longstanding practice. State v. Lodzinski, 246 N.J. 331, 339 (2021). Defendant was thus convicted by a jury of her peers in a fair trial, and three courts determined that the jury's guilty verdict should stand.

On reconsideration before a reconstituted Court, which we view to contravene the court rule that governs reconsideration, the majority

2

acknowledges the deferential standard that an appellate court must apply to a motion for a judgment of acquittal notwithstanding the evidence. Ante at ___ (slip op. at 38-39) (citing State v. Williams, 218 N.J. 576, 594 (2014); Reyes, 50 N.J. at 458-59). Contrary to that standard, however, the majority interprets much of the evidence in the light most favorable to defendant and derives from that evidence inferences that support defendant, not inferences that support the State. We consider the majority's reasoning to be premised on an improper application of the governing law.

In our view, today's decision undermines the core principle of appellate deference to a jury verdict in a criminal trial and undermines the jury's role at the heart of our criminal justice system. We consider the defendant's acquittal to be unwarranted and unjust. We respectfully dissent.

I.

A.

This Court reviews the trial court's decision denying defendant's motion for a judgment of acquittal for the second time.[1]

---

[1] Granting defendant's motion for reconsideration, the three members of the Court who had dissented in Lodzinski were joined by an Appellate Division judge temporarily assigned by the presiding justice to consider this matter in its final stage. State v. Lodzinski, 248 N.J. 451, 451-56 (2021). Thus reconstituted, the Court granted reconsideration despite the fact that no "justice or judge who concurred in the judgment or decision" supported

3

When a court reviews the sufficiency of the evidence supporting a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319. Thus, "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review <u>all of the evidence</u> is to be considered in the light most favorable to the prosecution." <u>Ibid.</u>

The test that this Court has prescribed conforms to the federal due process standard. <u>State v. Josephs</u>, 174 N.J. 44, 136-37 (2002); <u>State v. Brown</u>, 80 N.J. 587, 592 (1979). When it determines a motion for a judgment of acquittal notwithstanding the verdict under <u>Rule</u> 3:18-2, the reviewing court considers both the State's evidence and the defense's evidence. <u>Williams</u>, 218 N.J. at 594. The court must "giv[e] the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom," and decide whether "a reasonable jury could find guilt of

---

reconsideration, as <u>Rule</u> 2:11-6(b) mandates. <u>See</u> <u>id.</u> at 473-75 (Patterson, Fernandez-Vina, and Solomon, JJ., dissenting) (addressing the majority's grant of reconsideration in contravention of <u>Rule</u> 2:11-6(b)'s requirement). We view the Court's reconsideration of its prior determination -- and thus today's decision acquitting defendant -- to be unauthorized by our court rule. <u>Ibid.</u>

4

the charge beyond a reasonable doubt." Reyes, 50 N.J. at 458-59; accord Williams, 218 N.J. at 594. Although the State retains its burden to prove the defendant's guilt beyond a reasonable doubt, jurors are free to "draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt." Brown, 80 N.J. at 592.

Thus, the appellate role in reviewing the sufficiency of the evidence is strictly circumscribed. An appellate court may not interpret the evidence favorably to the defense, or even in a neutral manner; instead, it must consider all of the evidence in the light most favorable to the prosecution. Jackson, 443 U.S. at 319; Williams, 218 N.J. at 594; Reyes, 50 N.J. at 458-59. The court is not free to draw any reasonable inference from the evidence, as is a jury at trial; instead, it must derive from the evidence all reasonable inferences favorable to the State. Ibid. If any reasonable jury could find the defendant guilty of the offense charged -- here, the purposeful or knowing murder of her son, contrary to N.J.S.A. 2C:11-3(a)(1) and (a)(2) -- the conviction must stand.

### B.

In our view, the majority does the opposite of what our law requires. With respect to every component of the State's proofs, the majority scours the record for evidence favorable to defendant and draws inferences from that

evidence that favor defendant. The majority thus substitutes its own interpretation of the evidence for the conclusion reached by the jury.

1.

The first major category of proofs that supported a reasonable jury's guilty verdict at defendant's trial was the forensic and testimonial evidence regarding the location where Timothy Wiltsey's remains were found.

The State presented proofs that a child's skull, leg bones, and sneakers, as well as remnants of clothing, were found in or near Red Root Creek at the Raritan Center. See Lodzinski, 246 N.J. at 362-63 (Patterson, J., concurring).[2] Forensic analysis established that the skull and leg bones found at that location were Timothy Wiltsey's. Id. at 362. In response to the testimony of a defense expert witness suggesting that the child's body may have been moved by storm surge from the Raritan River to Red Root Creek, the State presented expert evidence that tidal activity could not have transported the body from the river to the narrow stream where the remains were found, and that the condition of those remains indicated that the child's body decomposed in that location, not elsewhere. See id. at 363.

_____

[2] The evidence presented by the State and defendant at trial is discussed in detail in our opinion concurring with the Court's per curiam decision affirming defendant's conviction. See Lodzinski, 246 N.J. at 362-76 (Patterson, J., concurring).

Fact witnesses testified that the location where the child's remains were found is four-tenths of a mile from the office of Florida Fulfillment, defendant's former employer, and that defendant would sometimes take walks around Raritan Center on her lunch breaks. See id. at 364.

The State also presented evidence that when defendant was asked to identify her previous employers, she disclosed other former employers but did not state that she had worked at Florida Fulfillment. See id. at 368-69. A police officer testified that after one of the missing child's sneakers was discovered at Raritan Center, investigators learned for the first time that defendant had been employed at Florida Fulfillment when a former co-worker contacted them to alert them about defendant's connection with that location. Ibid. The lead FBI investigator testified that when he asked defendant about her former employers months into the investigation, defendant identified Florida Fulfillment as a "Florida-based company," and revealed the employer's Raritan Center location only when she was directly asked for the location of its New Jersey facility. Id. at 369.

Considered under the Reyes standard, with the evidence viewed favorably to the State and the State afforded all reasonable inferences in its favor, that evidence supports a reasonable inference that defendant, alone or with others, deposited her son's body in or near Red Root Creek at the Raritan

7

Center, a location with which she was familiar, and then concealed her prior employment at that location because she knew that connection would implicate her.  That evidence supports a reasonable jury's determination that defendant is guilty of purposeful or knowing murder.

The majority all but ignores the discovery of Timothy Wiltsey's remains in a remote area less than a half-mile from defendant's former workplace.[3] Instead, it emphasizes the categories of evidence that the State did not present -- a confession by defendant, testimony from a witness who actually saw defendant injure or kill her son, and forensic evidence such as DNA or hair in defendant's home or car -- implicitly contending that a defendant may not be convicted of a crime without such evidence.  Ante at ___ (slip op. at 42).  The majority also relies on defendant's contention that she did not attempt to

_____

[3]  The majority finds it significant that in order for defendant to travel from her former workplace at Florida Fulfillment to what it calls the child's "burial site," "one would have to walk or drive south on Raritan Center Parkway, past another building, and then turn east onto Olympic Drive and travel a distance." Ante at ___ n.7 (slip op. at 23 n.7).  The State never contended that defendant walked or drove from her former workplace to Red Root Creek to deposit her son's body in or near Red Root Creek.  Instead, the State alleged that defendant was familiar with the area around Red Root Creek by virtue of her former employment at Florida Fulfillment, and that she chose that remote and desolate location to dispose of her son's remains.  See Lodzinski, 246 N.J. at 363-64 (Patterson, J., concurring).

8

conceal her prior employment at the Raritan Center from investigators.  Id. at ___ (slip op. at 21-22).

The majority thus adopts defendant's position that the discovery of Timothy Wiltsey's remains in a secluded area close to defendant's former workplace is not proof that she killed her son.  Id. at ___ (slip op. at 21-22, 42).  Instead of viewing the evidence regarding the location of the child's remains favorably to the State and deriving from that evidence the reasonable inferences favorable to the State that Reyes requires, the majority improperly minimizes the import of that evidence.

2.

The second category of proofs consisted of evidence regarding the blanket found near Timothy Wiltsey's remains.  The State presented the testimony of the child's three former babysitters -- defendant's niece Jennifer Blair-Dilcher, Danielle Gerding, and Dawn Matthews -- that they recognized the blanket as one that they had seen and used in defendant's home, as well as the testimony of a law enforcement officer present on the occasions when the former babysitters identified the blanket.  See Lodzinski, 246 N.J. at 342, 364-66 (Patterson, J., concurring).

Blair-Dilcher, who admitted before the jury that she and defendant were long estranged, stated that she had used the blanket found near the child's

remains at Raritan Center to "'snuggle up with Timothy.'" See id. at 365. Gerding testified that she had babysat for Timothy "once in a while" with Blair-Dilcher, who was her friend at the time, and identified the blanket as one that "was in [defendant's] home in the living room." See id. at 365-66. Matthews, who stated that she was unacquainted with the other two former babysitters, testified that the blanket found at Raritan Center was "like a light blue," with a distinctive metallic threading, and that she had previously seen it in defendant's apartment. See id. at 366. The investigating officer testified that the three babysitters stated that they recognized the blanket as defendant's, but that several other relatives and friends of defendant stated that they did not recognize the blanket. See id. at 365-66.

The majority contests the State's evidence regarding the blanket. Ante at ___ (slip op. at 4, 23-30). It relies on defendant's statement to police that she did not recognize the blanket, on the testimony of several of her family members and friends who did not identify the blanket as defendant's, and on the fact that the State presented no photographs depicting the blanket in defendant's home. Ante at ___ (slip op. at 4, 24, 27, 45-46).[4] The majority

---

[4] The majority evidently credits the statements of defendant and her witnesses disclaiming familiarity with the blanket when investigators showed it to them. Ante at ___ (slip op. at 4) ("[A] number of witnesses intimately familiar with Lodzinski's residences during the relevant time period could not identify the

10

cites the family conflict between Blair-Dilcher and defendant, who "blamed Lodzinski for the temporary loss of the custody of her children and for ruining her life." Ante at ___ (slip op. at 26-27, 44).

The majority further suggests that pretrial publicity may have prompted Timothy Wiltsey's former babysitters to testify that the blanket found at Raritan Center came from defendant's residence. See ante at ___ (slip op. at 4) (stating that the babysitters testified "in the midst of saturated pretrial publicity in this sensational murder case"); ante at ___ n.9 (slip op. at 29 n.9) ("News coverage abounded about the Lodzinski case and Blair-Dilcher's identification of the blanket in the weeks and months before Gerding made her identification.").

Finally, the majority invokes the speculative defense theory that exculpatory evidence may have been lost by virtue of an investigator's improper handling of the blanket when it was discovered at Raritan Center. Ante at ___ (slip op. at 23) ("Agent Butkiewicz found the blanket but did not photograph it before he pulled it from the ground and shook dirt from it -- and perhaps trace evidence."); ante at ___ (slip op. at 46) (noting that the

_____

blanket."); ante at ___ (slip op. at 24) ("When shown the blanket by Lieutenant Rizzo, neither Lodzinski nor her parents recognized it."); ante at ___ (slip op. at 27) (declaring that four relatives and friends of defendants were shown the blanket, and "[n]one recognized the blanket").

11

investigator "did not photograph or carefully retrieve" the blanket, but rather "pulled it from the ground and shook dirt from it -- and perhaps forensic evidence").

The majority thus premises its opinion on an interpretation of the facts favorable to defendant, not to the State.

The majority acknowledges that under the governing standard, "[a] reasonable jury was entitled to credit the testimony of the three babysitters and conclude that the blue blanket came from Lodzinski's apartment -- and therefore Timothy was not at the carnival." Ante at ___ (slip op. at 46-47) (citing Brown, 80 N.J. at 592). If accepted by the jury, however, evidence regarding the blanket is probative of much more than Timothy's absence from the carnival. A rational jury could reasonably infer from that evidence that after killing her son, defendant took a blanket from her home and used it to transport her son's body to Red Root Creek at Raritan Center. Considered in accordance with Reyes, that evidence strongly supports a reasonable jury's guilty verdict as to the charge of purposeful or knowing murder.

3.

The third category of proofs presented by the State related to defendant's contradictory accounts of her son's abduction at the carnival, and her conduct

12

following the alleged abduction that was inconsistent with her claims. See

Lodzinski, 246 N.J. at 343-48, 366-69 (Patterson, J., concurring).

In her initial report of her son's disappearance, defendant stated she

briefly looked away from the child to purchase a drink and when she turned

around, he was gone. See id. at 343-44.

In the days that followed, defendant provided investigating officers with

increasingly elaborate descriptions of the alleged abduction. See id. at 344-48.

Defendant stated that the child was taken by two men, one older and one

younger. See id. at 344. She then claimed that Timothy was abducted by a

former acquaintance named "Ellen," a "go-go girl" who drove a Camaro. See

id. at 345. Defendant initially contended that Ellen, accompanied by two tall

men and a toddler, offered to watch Timothy while defendant purchased a

soda, and that when defendant returned, Ellen, the two men, the toddler, and

Timothy were gone. See ibid. In another version of the events that defendant

offered to the investigators, Ellen, accompanied by two men, offered to put

Timothy on a ride, and then one of the men threatened defendant with a knife,

first described by defendant as a long hunting knife and later as a pocket knife.

See id. at 345-46. In yet another account, defendant reported that the

abduction was committed by Ellen accompanied by one man, and that a second

13

man later accosted defendant, threatened her with a knife, and told her that she might hear from him "in a month or so." See id. at 347-48.

Defendant's accounts of the abduction thus contradicted one another with respect to the individuals involved, the events immediately preceding the crime, the weapon purportedly used by the abductors to intimidate defendant, the threats made by the abductors, and defendant's own actions during and after the abduction. See id. at 344-48. Law enforcement officers testified that defendant herself admitted that some of the versions of her abduction story were untrue. See id. at 344-46, 367.

The State also presented evidence that in the aftermath of Timothy Wiltsey's disappearance, defendant did not act consistently with her story that her son had been abducted from the carnival and might be found alive. See id. at 367-68. Blair-Dilcher, Gerding, and law enforcement officers who initially responded to their report of Timothy's disappearance reported that defendant did not say that her child was abducted. See ibid. An officer testified that he and another officer drove defendant to her home to retrieve items belonging to the child that might enable a canine search team waiting at the carnival site to track him. See id. at 368. The officer stated that instead of returning directly to the carnival site with the items, defendant insisted on stopping for ten to fifteen minutes at the bar where her boyfriend worked, thus delaying the

14

search for her son.  See id. at 368.  A witness testified that despite defendant's statement that one of her son's abductors had told her that she might receive a call about the child, she did not retrieve a message left on her voicemail the night of her son's disappearance.  See id. at 346, 368.  Other witnesses testified that while the search for Timothy remained underway, defendant moved from her home to stay with friends and travel to Florida and the Bahamas, and was thus unavailable to receive any call from the purported abductors.  See id. at 368.

Considered in accordance with the Reyes standard, with the evidence construed in the State's favor and all reasonable inferences drawn favorably to the State, this evidence supports a reasonable inference that defendant sought to mislead investigators with false abduction stories in order to impede the investigation and deflect attention from her own culpability.  See id. at 369.  A reasonable jury could find that testimony to be post-crime consciousness-of-guilt evidence, which may constitute proof of a defendant's culpability.[5]  The

---

[5]  As we have recognized, "a defendant's post-crime conduct evidencing a guilty conscience provide[s] a sound basis from which a jury logically could infer that a defendant was acting consistent with an admission of guilt or that the conduct was illuminating on a defendant's earlier state of mind."  State v. Williams, 190 N.J. 114, 126 (2007).  "[W]hen determining an accused's mental state, generally, it is helpful to the factfinder to be able to draw inferences from the totality of the events, including the 'final link[s] in [a] chain of evidence which [is] admissible as indicative of a consciousness of

15

evidence also supports a reasonable inference that defendant knew when she arrived at the carnival that her child was already dead and that any search for him in or around the carnival site would be futile.  See id. at 369.  A rational jury could reasonably infer from that evidence that defendant had killed her child and that she provided false accounts of an abduction in order to impede the investigation.

The majority does not view the evidence of defendant's conflicting statements and conduct after her son's disappearance favorably to the State or draw all reasonable inferences favorable to the State, as Reyes requires. Instead, it posits alternative explanations for defendant's statements and conduct.  Adopting a theme of the defense case, the majority attributes defendant's conduct after her son's disappearance to stress prompted by police interrogations and publicity about the case.  Ante at ___ (slip op. at 15-20). The majority draws the inference that defendant delayed her return to the

---

guilt.'"  Id. at 126 (all alterations but first in original) (quoting People v. Maldonado, 278 N.E.2d 225, 230 (Ill. App. Ct. 1971)); see also State v. Cole, 229 N.J. 430, 454 (2017) ("Our jurisprudence regarding consciousness-of-guilt evidence derives from the principle that certain conduct may be 'intrinsically indicative of a consciousness of guilt,' and may therefore be admitted as substantive proof of the defendant's guilt."  (quoting State v. Phillips, 166 N.J. Super. 153, 160 (App. Div. 1979))); State v. Rechtshaffer, 70 N.J. 395, 413 (1976) ("Declarations subsequent to the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence or tend to establish intent are relevant and admissible.").

16

carnival site with the items needed for the canine search team because she was upset by her son's disappearance. Ante at ___ (slip op. at 11). It suggests that defendant went to Florida while the search for her son continued in order to escape publicity and seek counseling. Ante at ___ (slip op. at 20).

The majority concedes, as it must, that a rational jury could infer that "Lodzinski's inconsistent statements indicated she was lying to conceal a crime," and that "her false accounts were evidence of consciousness of guilt." Ante at ___ (slip op. at 49-50). It declares itself uncertain as to what crime the jury could have inferred that defendant attempted to conceal, however. Ante at ___ (slip op. at 50). The majority suggests that consciousness-of-guilt evidence does not support a conviction because "[t]he testimony did not shed light on exactly what happened to Timothy, and the medical examiner did not indicate that Timothy's death was purposely or knowingly caused." Ante at ___ (slip op. at 50).

In short, instead of applying the deferential standard of Reyes to the evidence of defendant's statements and conduct after her son's disappearance, the majority dismisses that evidence because the circumstances of the child's death are unknown. In so doing, the majority exercises a prerogative that belonged only to the jury.

17

## 4.

The fourth major category of evidence that the State presented in this case was evidence of motive. See Lodzinski, 246 N.J. at 369-70 (Patterson, J., concurring). Fact witnesses testified that defendant, raising her son with no financial support from his father, had difficulty finding adequate child care, maintaining a job, and establishing a stable relationship. See ibid. That evidence supports a reasonable jury's conclusion that defendant had a motive to kill her son and that she purposely or knowingly caused the child's death. See N.J.S.A. 2C:11-3(a)(1), (a)(2).

The majority invokes the testimony of witnesses that defendant was a loving and dedicated mother. Ante at ___ (slip op. at 13, 54-55). Evidently offended by the State's evidence of motive, it dismisses that evidence as "based on questionable tropes and stereotypes about single working mothers." Ante at ___ (slip op. at 12-14, 53). The majority does not view the State's evidence of motive favorably to the State as Reyes mandates, but rejects that evidence as unpersuasive, thus usurping a role that is the jury's alone.

## 5.

The final major category of evidence presented by the State consisted of the opinions of an expert witness in anatomical, clinical, and forensic pathology. See Lodzinski, 246 N.J. at 370-71 (Patterson, J., concurring). The

18

expert stated that, given the decomposition of Timothy Wiltsey's body and the disappearance of most of his remains, the cause of the child's death could not be determined. See id. at 371. The expert witness opined, however, that the manner of death in the case of Timothy Wiltsey was homicide, based on the location and condition of the child's remains and the elimination of three alternative causes of a child's death -- a disease or other medical condition, a suicide, and an accident. See ibid. Viewed favorably to the State and with all reasonable inferences favoring the State, the expert testimony supports a rational jury's determination that Timothy Wiltsey died by homicide.

The majority finds the expert's testimony inadequate to support defendant's conviction because she "did not attempt to classify Timothy's death as any particular kind of homicide"; because she "avoided speculating or conjecturing about the degree of homicide that led to Timothy's death"; and because she "did not speculate about the degree of homicide -- that is, whether Timothy's death was caused negligently, recklessly, or purposely or knowingly." Ante at ___ (slip op. at 32, 52).[6] The State's expert witness, however, appropriately refrained from opining on the question of defendant's

---

[6] The jury was charged as to first-degree knowing or purposeful murder as well as the lesser-included offenses of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). See Lodzinski, 246 N.J. at 351 (Patterson, J., concurring).

19

guilt of any specific charge.  See State v. McLean, 205 N.J. 438, 453 (2011) (noting this Court's "well-established rulings that experts may not . . . usurp the jury's function by . . . opining about defendant's guilt or innocence"); State v. Papasavvas, 163 N.J. 565, 612-13 (2000) (noting that an expert witness may not express a direct opinion as to the defendant's guilt or innocence); State v. Jamerson, 153 N.J. 318, 340 (1998) (holding that an expert's opinion as to whether an auto accident was the result of defendant's recklessness improperly invaded the jury's province as the finder of ultimate fact); State v. Reeds, 197 N.J. 280, 285 (1997) (noting that an expert may not address the ultimate issue of a defendant's guilt); Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 704 (2021) ("[I]n criminal cases it is clear that an opinion stating that the defendant is guilty is clearly impermissible.").  The expert's opinion was not deficient because she did not advocate a guilty verdict as to any of the three charges that the jury considered; rather, it was admissible precisely because she withheld any such opinion.

It was the jury's prerogative to decide whether to credit the properly-admitted testimony of the State's expert witness, and to give it the weight that it warranted.  See Model Jury Charges (Criminal), "Expert Testimony" (rev.

20

Nov. 10, 2003). In our view, the majority's after-the-fact rejection of that testimony infringes on the jury's exclusive province.[7]

C.

Notwithstanding the majority's criticism of each component of the State's proofs, it concedes that when the evidence is viewed in accordance with Reyes, a rational jury "could conclude that Lodzinski did not take Timothy to the carnival and that she had some involvement in his disappearance, death, and burial." Ante at ___ (slip op. at 58). The majority identifies as the sole basis for its grant of a judgment of acquittal a single alleged flaw in the State's proofs: the State's purported failure to offer "direct or inferential evidence that Lodzinski purposely or knowingly caused Timothy's death -- an essential element of the crime of murder." Ante at ___ (slip op. at 58).

---

[7] The majority also cites the testimony of five defense witnesses who told police after Timothy Wiltsey's disappearance that they saw a child who may have been him at the Sayreville carnival on May 25, 1991, but expressed uncertainty as to whether the child was Timothy. Ante at ___ (slip op. at 43, 49). It notes the testimony of another defense witness, Damien Dowdle, who alleged that his former cellmate, Joseph McShane, may have killed Timothy Wiltsey, but notes that Dowdle's claim was unsupported by any evidence that McShane was ever in New Jersey or was involved in Timothy Wiltsey's death. Ante at ___ (slip op. at 32).

That contention is belied by the trial record. The State presented factual evidence that defendant had a motive to kill Timothy, and thus acted with the purposeful or knowing mens rea that the law requires. It offered testimony that defendant chose a remote area near her former workplace to dispose of her son's remains, thus supporting the jury's finding that defendant acted intentionally. The State presented evidence of defendant's consciousness of guilt. And it presented expert evidence that Timothy Wiltsey died as a result of a homicide.

The jury could have chosen to acquit defendant of murder and convict her of aggravated manslaughter, or to acquit her of murder and convict her of reckless manslaughter, or to acquit her of all three charges. It determined, however, that the State had proved beyond a reasonable doubt that defendant murdered her son. As the judge who oversaw the trial and a unanimous Appellate Division panel ruled, the jury's verdict was fully justified by the evidence. This appeal presents a "record of historical facts that supports conflicting inferences" in which this Court must presume that the jury resolved those conflicts in the State's favor, and should "defer to that resolution." Jackson, 443 U.S. at 326.

In our view, the majority usurps the exclusive province of the jury that heard the evidence at defendant's trial. We consider that decision to be a

22

disservice to our jury system and a grave injustice to the victim, five-year-old Timothy Wiltsey.  We respectfully dissent.